Laramore, Judge,
delivered the opinion of the conrt:
This is a suit to recover amounts paid by the plaintiffs to the United States as excise tax on the transportation of persons in connection with the operation of a sightseeing business. Said tax was allegedly illegally and erroneously collected for the years 1953 to 1957.
For the purposes of this opinion, we shall treat the petitioners Armand A. Gumpert and Eichard J. Batt, Jr., as though they were a partnership for the period involved, and will hereinafter refer to petitioners as plaintiffs.
Throughout the period involved, plaintiffs were engaged in the business of operating sightseeing tours by means of limousines to various points of interest in the City of New Orleans, Louisiana. During this period plaintiffs paid excise taxes for each year involved, totaling $12,754.37. In 1957, plaintiffs ceased paying this excise tax on the assumption that the tax was imposed illegally and erroneously. This suit is the culmination of plaintiffs’ efforts to have returned to them the tax collected from them for the years in dispute.
*723 The pertinent sections of the Internal Revenue Code of 1954, under which part of the tax collected was imposed, state:[1]
Sec. 4261. Imposition of Tax.
(a) Amounts Paid, Within the United States. — There is hereby imposed upon the amount paid within the United States for the transportation of persons by rail, motor vehicle, water, or air within or without the United States a tax equal to 10 percent of the amount so paid.
% ifc # * *
Sec. 4262. Exemptions.
(b) Commutation Travel, Etc. — The tax imposed by section 4261 shall not apply to amounts paid for transportation which do not exceed 35 cents, to amounts paid for commutation or season tickets for single trips of less than 30 miles, or to amounts paid for commutation tickets for one month or less.
(c) Small Vehicles on Nonestdblished Tines. — The tax imposed by section 4261 shall not apply to transportation by motor vehicles having a passenger seating capacity of less than ten adult passengers, including the driver, except when such vehicle is operated on an established line.
Hence it is the contention of the plaintiffs that their enterprise falls within the exemption granted by section 4262 (c), and consequently it follows that the tax should not be imposed. The plaintiffs contend that the services furnished by them were not subject to the transportation tax because (1) the statutes do not impose any tax on “sightseeing,” (2) their limousines were not operated on an “established line,” (3) the cost of the transportation element of the tour amounted to less than 60 cents per fare (§ 4262(b) was amended by Act of Aug. 7, 1956, which substituted “60” for “35” cents), and (4) the doctrine of estoppel should be applied in their favor.
Whatever merit may lie in plaintiffs’ contentions is not now considered by the court, because we are of the opinion that it is not only unnecessary to consider these issues, but inappropriate to do so. It is our view that plaintiffs have *724 failed in their burden to show that they have a proper standing to bring this suit. Sections 8471 and 6415 of the 1939 and 1954 Internal Eevenue Codes, respectively,[2] allow a collector of the tax to seek a refund thereof only if he establishes that he has repaid the amount of such tax to the person from whom he collected it, or has obtained the consent of such person to the allowance of the credit or refund. However, plaintiffs do not allege that they made a refund to their passengers of the transportation taxes involved, or that they have obtained the consent of the passengers to the allowance of the refund sought in this suit. They admit that they have not complied with either of these provisions; instead they argue that these provisions are inapposite to their situation because they paid the tax themselves instead of collecting the tax from their passengers, hence plaintiffs contend that they bore the economic burden and are entitled to relief. In support of their position, plaintiffs cite Abbott et al. v. United States, 146 Ct. Cl. 272, wherein it was held that taxpayers were entitled to a refund on the theory that they had borne the economic burden of the tax where it was found as a fact that taxpayers had paid the tax out of their own pockets. However, the only evidence in the instant case that plaintiffs have borne the economic burden of the tax is a naked allegation by the plaintiffs that they carried the tax as an expense of doing business, hence they paid the tax. The evidence does not substantiate this contention. It was shown (1) that the basic ticket price was $4 or $5 plus 10 percent or 15 percent depending on the appropriate amount of the excise tax rate currently then in effect; (2) that the price of the *725 ticket changed with a corresponding change in the tax rate; and (3) that the tonr tickets themselves reflected the tax, in that there was a place for the price of the tonr and a place for the amount of the tax. Where an operator is performing a service that is subject to a tax, and that tax is a flat percentage of the cost of the service, it is reasonable to presume that the cost of the service is increased by the amount of the tax. This is a rebuttable presumption, to be sure, but the burden is on the entrepreneur to show that he paid the tax out of his own pocket rather than to have passed this expense on to the customer. It is an unusual situation where a successful businessman, fully aware that his enterprise is being taxed at the rate of 10 or 15 percent, pursuant to which he files tax returns and actually pays the amount of the tax to the Government, would fail to include the cost of the tax when determining the price he would charge his customers. If he has passed this expense on to his customers, then he does not have the proper standing to maintain this action. This, in our view, is what the plaintiffs did in the instant case. However, as plaintiff urges, there is authority that the plaintiff is entitled to recover, even though he had not borne the economic burden of the tax, where the tax is illegally assessed. 123 East Fifty-Fourth Street, Inc. v. United States, 62 F. Supp. 488 (1945). In that case the court expressly stated that it would like to deny recovery on the ground that the plaintiff would be unjustly enriched because it had passed the tax on to its customers, but felt constrained not to do so in the absence of a statute limiting the right to recovery. The court stated at page 492:
I am aware that the plaintiff will receive a windfall and that the result is objectionable, but it is not the function of the court to insert something into the statute which the Congress has not placed there. Perhaps the omission was an oversight. If so, the remedy is with the legislative branch, * * *.
We are not faced with that problem here, as Congress saw fit by statute to limit the right to recovery in order to preclude what would otherwise result in unjust enrichment.[3]
*726 Therefore, plaintiffs must show by the weight of the evidence that they have complied with the provisions of the statute, which admittedly plaintiffs have not done, or that they have borne the economic burden of the tax, which in this instance plaintiffs have failed to show.
Since it is our view that plaintiffs have neither borne the economic burden of the tax, nor refunded the amounts collected to their customers, nor obtained consents from those who did bear the burden, the conclusion is clear that plaintiffs are without standing to sue, and the petition will be dismissed.
It is so ordered.
DarR, Senior District Judge, sitting by designation; Durfee, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
FINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner Mastín G. White, and the briefs and argument of counsel, makes findings of fact as follows:
1. Under the petition, as amended, the plaintiffs in this action are Armand A. Gumpert and Bichard J. Batt, Jr.
2. Throughout the period involved in the litigation (from September 1958 through September 1957), the plaintiff Armand A. Gumpert was engaged in the business of operating sightseeing tours by means of a limousine or limousines to various points of interest in the city of New Orleans, Louisiana. Except for the months of May through October 1954, Mr. Gumpert operated the business as a sole proprietorship. During the months of May through October 1954, Mr. Gum-pert was in partnership with the plaintiff Bichard J. Batt, Jr., and the business was operated by the partnership under the name of “Sightseeing with Gumbo.” Each partner had a 50-percent interest in the sightseeing business during the partnership period. (For the sake of convenience, whenever the plural “plaintiffs” is used hereafter in the findings, it will mean the plaintiff Armand A. Gumpert with respect to the period when he individually operated the sightseeing business, and it will mean the plaintiffs Armand A. Gumpert and Bichard J. Batt, Jr., with respect to the period when the sightseeing business was operated by the partnership.)
*727 3. (a) The number of limousines used by the plaintiffs in the sightseeing business varied at times from one to three. Each limousine had a passenger seating capacity of eight adult persons, including the driver.
(b) "When only one limousine was in use by the plaintiffs, it was driven by the plaintiff Gumpert. When two or three limousines were in use, one was driven by the plaintiff Gum-pert and each other limousine was driven by an operator hired for that purpose by the plaintiffs. The driver of a limousine (whether the plaintiff Gumpert or a hired employee) also served as a lecturer to explain the points of interest to the passengers.
4. With relatively few exceptions, the plaintiffs obtained their sightseeing passengers from motels located along a strip, about 3y2 miles in length, of the Chef Menteur Highway (U.S. Highway 90) on the outskirts of New Orleans. A majority of the passengers were obtained from a single motel, the Saxony, which served as a sort of headquarters and base of operations for the plaintiffs.
5. The plaintiffs conducted three types of sightseeing tours within the city of New Orleans and its environs: the regular day tour, the regular night tour, and the special or charter tour.
6. (a) The regular day tour was conducted twice each day, once in the morning and again in the afternoon, if passengers could be obtained for it. This tour began in the morning with the pick-up of passengers at about 9 o’clock from the motels mentioned in finding 4, and it began in the afternoon with the pick-up of passengers at about 1:30 p.m.
(b) The regular day tour covered approximately 35 miles, and it lasted about 3% hours. It included certain major points of interest that were visited in a prescribed sequence, and the driver conducting a regular day tour was expected to, and generally did, maintain a fixed time schedule with respect to arrivals at and departures from some of these major points of interest. The driver usually followed the same route each time in traveling from one major point of interest to another, but there were occasional minor variations, as there were intermediate points of possible interest which a driver might add to or eliminate from the tour in ac *728 cordance with his impression of the passengers’ inclinations.
(c) Upon the conclusion of the regular day tour at about 12:30 p.m. or 5 p.m., some of the passengers (estimated at about 10 percent, overall) might be left downtown at their request in the vicinity of the famous French Quarter restaurants. The other passengers would be returned to their respective motels.
(d) A fixed charge of so much per person was made for the regular day tour. This charge was $4.60 per person during the early part of the period involved in the litigation, but it was later reduced to $4.40 per person. The amount of the charge was quoted to passengers and prospective passengers as a lump sum. No expressed division was made allocating specific amounts between fare and tax, although the tickets themselves provided spaces designated “fare” and “tax”.
7. (a) The regular night tour was conducted each night, if passengers could be obtained for it. This tour began with the pick-up of passengers at about 8:30 p.m. from the motels mentioned in finding 4; it lasted approximately 5% hours; and it included visits to nightclubs and other places of entertainment in downtown New Orleans. As a general rule, all such tours covered the same points of interest in the same sequence and over the same route. A schedule was observed in order to arrive at the various shows on time.
(b) A fixed charge of so much per person was made for the regular night tour. This charge was $5.75 per person during the early part of the period involved in the litigation, but it was later reduced to $5.50 per person. The amount of the charge was quoted to passengers and prospective passengers in exactly the same manner discussed in finding 6(d).
8. (a) The special or charter tour involved the hire of a limousine and driver to a group of people. The points of interest to be seen on such a tour, the time of departure and return, the amount to be paid for the tour, and other details were agreed upon as a result of negotiations between the parties concerned.
*729 (b) The special or charter tours were infrequent and constituted only a small part of the plaintiffs’ sightseeing business.
(c) Negotiations with respect to the charges for special or charter tours were conducted in the same manner discussed in finding 6(d).
9. (a) In connection with the operation of the sightseeing business mentioned in the previous findings, the plaintiffs filed with the Internal Revenue Service quarterly excise tax returns relative to the transportation of persons, and timely paid the amounts of tax shown on such returns to be due.
(b) The following table shows the excise tax payments that were made by the plaintiff Armand A. Gumpert:

(c) The following table shows the excise tax payments that were made by the partnership consisting of the plaintiffs Armand A. Gumpert and Richard J. Batt, Jr.:

(d) The evidence in the record is not sufficient to permit the tax payments that are set out in paragraphs (b) and (c) of this finding to be allocated on the basis of the regular day tours, the regular night tours, and the special or charter tours.
*730 (e) The tax payments were treated by the plaintiffs for accounting purposes as an expense of operation.
10. (a) On November 16,1956, a claim for refund of excise tax, Form 843, signed by David W. Palmer, attorney for Armand A. Gumpert, was filed with the Internal Revenue Service for the period September 1953-December 1953. This claim was in the amount of $671.20, and it alleged in part that the taxpayer did not operate on an established line and that he bore the economic burden of the tax.
(b) On March 20, 1957, a second claim for refund, Form 843, was filed as an amendment to the claim of November 16, 1956. This second claim was in the amount of $7,758.75, and it indicated that it was for the period October 1953-December 1955. It was signed by David W. Palmer, attorney for Armand A. Gumpert.
(c) On March 21, 1957, a third claim for refund, Form 843, was filed as an amendment to the claims mentioned in paragraphs (a) and (b) of this finding. The third claim was in the amount of $147.70 and covered only the month of December 1956. It was signed by David W. Palmer, attorney for Armand A. Gumpert.
(d) On November 6, 1957, a plea in abatement on Form 843 was filed for September 1957 in the amount of $186.25. It was signed by David W. Palmer, attorney for Armand A. Gumpert.
(e) On April 15,1959, a fourth claim for refund was filed on Form 843 for the period September 1953-September 1957. It was in the amount of $12,754.37 and was signed by David W. Palmer, attorney for the claimant. The taxpayer listed on the form was “Armand A. Gumpert T/A Gumbo Sightseeing Tours, Sightseeing with Gumbo, etc.”
(f) The name of Richard J. Batt, Jr., did not appear on any of the claims for refund, and the evidence in the record does not show that Mr. Batt authorized Mr. Palmer to file a claim for refund in his behalf.
11. None of the claims referred to in finding 10 has been allowed by the Internal Revenue Service.
12. The plaintiffs do not allege, and the evidence in the record does not show, that the plaintiffs repaid to their passengers the amounts of the taxes referred to in finding 9, or *731 that the plaintiffs have obtained the consent of the passengers to the allowance of the refund sought in this suit.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover, and the petition is dismissed.

 The pertinent provisions under ttie Internal Revenue Code of 1939, § 3469, are essentially similar.

 § 3471. Refunds and credits
(a) Credit or refund of any overpayment of tax imposed by Subehapter B, Subchapter C, or Subchapter E may be allowed to the person who collected the tax and paid it to the united States if such person establishes, to the satisfaction of the Commissioner, under such regulations as the Commissioner with the approval of the Secretary may prescribe, that he has repaid the amount of such tax to the person from whom he collected it, or obtained the consent of such person to the allowance of such credit or refund.
§ 6415. Credits or refunds to persons who collected certain taxes
(a) Allowance of credits or refunds. — Credit or refund of any overpayment of tax imposed by section * * * 4261, * * * may be allowed to the person who collected the tax and paid it to the Secretary or his delegate if such person establishes, under such regulations as the Secretary or his delegate may prescribe, that he has repaid the amount of such tax to the person from whom he collected it, or obtains the consent of such person to the allowance of such credit or refund.

 See sections 3471 and 6415 of the 1939 and 1954 Internal Revenue Codes, respectively, supra.