INTERNATIONAL BUSINESS MA-
CHINES CORPORATION

v.

The UNITED STATES.

No. 36–61.

United States Court of Claims.
April 16, 1965.

Cowen, Chief Judge, dissented.

Daniel M. Gribbon, Washington, D. C., for plaintiff. William H. Allen, Robert L. Randall, Charles W. Wolfram and Covington & Burling, Washington, D. C., of counsel.

C. Moxley Featherston, Washington, D. C., with whom was Asst. Atty. Gen., Louis F. Oberdorfer, for defendant. Lyle M. Turner, Washington, D. C., was on the brief.

Before COWEN, Chief Judge, and LARAMORE, DAVIS and COLLINS, Judges.

DAVIS, Judge.

International Business Machines Corporation (the taxpayer) and Remington Rand were, in the years 1951–1958, the

two competitors in the manufacture, sale, and leasing of larger electronic computing systems. Before mid-April 1955, both companies paid on these articles the ten percent excise tax imposed by Section 3406(a) (6) of the Internal Revenue Code of 1939 and its replacement, Section 4191 of the 1954 Code, for the sale or lease of "business machines" [1]. On April 13, 1955, Remington Rand requested a ruling from the Commissioner of Internal Revenue that certain of its computing devices (including the Univac 120 and 60) were not subject to this tax. Two days later, April 15th, the Commissioner issued such a private ruling in the form of a short telegram to Remington Rand. Having learned through its customers of this determination, the taxpayer sought, on July 13th, a similar ruling for its competing computer (Type 604) which was identical in all significant respects with the Univac systems. Plaintiff's letter was captioned "Urgent! Please Expedite", and it closed with this sentence: "In view of the extreme urgency of this matter, your immediate ruling, wire collect, is respectfully requested." The information submitted with this letter was at least as extensive as that in Remington's application of April 13th. Shortly after making this request, plaintiff also filed, on July 29th, a refund claim (in the amount of $5,832,444.41) for the excises paid from June 1, 1951, to May 31, 1955. Late in September 1955, Remington filed a comparable refund claim (of $300,000) for similar taxes paid from January 1, 1952, to April 30, 1955.

The Commissioner did not act on the taxpayer's request for a ruling, or on its refund claim, for well over two years. During this period he did not seek more information from, or communicate with, the taxpayer which continued to pay the excise taxes on its computers. In July 1956, however, Remington received a refund of over $86,000 on its refund claim for the period from 1952 to April 1955;

and, of course, that company did not pay the excise taxes on the transactions completed after issuance of the private ruling of non-coverage in April 1955.

On May 1, 1957, the Internal Revenue Service wrote to Remington that, having "had occasion to give further consideration to the question of the taxability of electronic calculating or computing equipment", the Service had concluded that such devices were taxable as business machines and therefore it proposed to revoke, *prospectively,* "our telegraphic ruling to you of April 15, 1955." But, the Service continued, "we will withhold further action on the matter for a period of thirty days from the date of this letter in order to afford you an opportunity, should you so desire, of submitting a protest or requesting a hearing in the case." On May 31st Remington asked for a conference, which was held on June 25th. A month later, on July 25th, Remington summarized in writing its arguments against revocation of the favorable decision of April 1955. It was not until December 3, 1957, that the Service wrote Remington that it had finally concluded the Univac 120 and 60 machines were taxable, but that this new ruling would apply only to sales made and leases in effect "on and after the first day of the first month which begins thirty days after the date of this letter", i. e., the machines would not be deemed taxable until February 1, 1958. As a result of this ruling and the refund made in 1956, Remington was permitted to dispose of its Univac computers, for the six-year span from the beginning of January 1952 to the end of January 1958, without paying the excise.

Some days before the letter to Remington revoking the earlier ruling, the Service informed the plaintiff, on November 26, 1957, that, "after extensive study of the question of the taxability of electronic calculating or computing equipment," it had decided that the plaintiff's equipment "herein involved and similar equipment" were taxable as business ma-

---

1. These sections list, by type, a considerable number of machines and devices, from

"adding machines" to "time recording devices."

chines. The Service's letter observed that "the manufacturer of the machines which compete with and are similar to the taxable machines herein involved [i. e., Remington Rand] * * * is being appropriately advised by us regarding the taxability of such machines of its manufacture." This letter of November 26, 1957, constituted the Service's response to IBM's application of July 13, 1955, for a ruling freeing its computers from the tax.

To protect its interests, the taxpayer filed (in April 1958) a second refund claim for the subsequent period from June 1, 1955 to January 31, 1958. On February 3, 1959, the Service disallowed both of the taxpayer's refund claims. Plaintiff was thus held liable for the excise tax for the full period from June 1951 through January 1958—roughly the same period for which Remington had been relieved of the tax. This suit was timely brought on February 1, 1961, to recover $13,335,762.11, said to have been paid during those six and one-half years. Plaintiff does not deny that its computers are "business machines" under Section 3406 of the 1939 Code and Section 4191 of the 1954 Code. Its position is that the Internal Revenue Service's conduct toward it, in contrast to the treatment of Remington Rand's identical machines for the same period, invalidates the excise taxes levied under those Code sections on the IBM equipment.

I

The Government denies that the plaintiff has standing to sue for any but a small portion of the claimed refund. Section 6416(a) (1) of the 1954 Code specifies that "no credit or refund of any overpayment of" the manufacturers' tax shall be allowed or made unless the claimant establishes either that he has not passed on the tax or has repaid the tax to his purchaser or has filed with the In-

ternal Revenue Service the "written consent" of the ultimate purchaser to the allowance of the credit or the making of the refund. (Section 3443(d) of the 1939 Code sets forth similar requirements.) When this suit was begun on February 1, 1961, plaintiff did not file or have such customer consents; but it did assert that it would submit the necessary papers once its claim had been allowed. The Government moved to dismiss on the ground, among others, that the taxpayer could not sue for taxes passed on to its vendees unless it had their consents on hand before the expiration of the two-year limitation period for refund suits (February 3, 1961). The court denied the motion without prejudice and remanded the case for a development of the facts on this issue, as well as on the merits.

It has now been determined that, of the total sum which plaintiff seeks in this litigation, almost $252,000 represents excises paid by plaintiff on computers directly put to its own use; this amount was not passed on to others but was wholly absorbed, and the taxpayer is concededly entitled to sue for its recovery.

After April 30, 1963 (i. e., since the close of the two-year limitations period), the taxpayer obtained and filed 3,190 customer consents representing over $11,-000,000 in taxes.[2] The defendant renews its attack on plaintiff's standing to claim these payments. The contention is that no consent is valid unless obtained prior to the expiration of the statutory period for bringing refund litigation.

■ There is no impediment, we hold, to plaintiff's right to maintain this suit for all the taxes for which customer consents have been or will be given before the amount of recovery is finally fixed. Section 6416(a) (1) limits the actual refund, to be made if plaintiff prevails, to the excises borne by it or for which it procures consents before final judgment, but the statute does not condition plaintiff's right to sue on its having received

2. The United States, a large purchaser from the taxpayer, declined to execute consents. Of the total for which tax-

payer sues, over $1,250,000 represents such taxes passed on to the Government.

customer permission prior to suit or before the two-year limitations period expires. Congress was obviously concerned that the manufacturer not fall heir to a windfall by recovering taxes, already passed on to its vendees, which it could withhold from them against their will. For this end, the important moment would be the time of actual refund, not the institution of the action. There is no hint in the phrasing of the statute that Congress wished the assurance against a windfall to be firmly established before suit was or could be brought; and there are good reasons why that requirement should not be superimposed. In this case, for example, there are upwards of 3,000 separate customers to whom taxpayer passed on the tax during the critical years. It is sensible to insist that, if plaintiff wins, no refund for any particular tax be given until the necessary consent is filed, but it is less sensible to demand that the taxpayer undertake the burden of gathering all the consents before the tribunal has even had a chance to decide whether there can be any recovery at all.[3] No meaningful interest would be advanced, in a case like this in which the substantive issues will have to be reached (see footnote 3), by a technical demand that the consents which are to be recognized must all have been collected at the time of suit or when the cause of action first accrued.

■ The Commissioner of Internal Revenue has already accepted the position we adopt. Section 6416(a) (1) applies equally to claims for administrative refunds and to refund actions. See United States v. Jefferson Electric Mfg. Co., 291 U.S. 386, 395, 398, 400, 54 S.Ct. 443, 78 L.Ed. 859 (1934). In 1958, the Commissioner formally ruled that the consent provision has "no relation to the timely filing of a claim." The requirement "does not mean that the written consents must be attached to or submitted with the claim or that failure to do so renders the claim faulty so far as timely filing is concerned. Like any other evidence necessary to support a claim, written consents of ultimate purchasers may be filed with the claim or subsequent thereto." Rev. Rul. 58–563, 1958–2 Cum.Bull. 892, 893. Since the statute deals interchangeably with administrative and judicial claims, there is no reason why this authoritative administrative interpretation should be confined to refunds by the Service or why we should reject its teaching. The trend in the courts has not been otherwise; they have generally held no more, in a case like this, than that a taxpayer's ultimate recovery is conditioned upon persuading the judge that he has absorbed the tax or secured the necessary consents. United States v. Jefferson Electric Mfg. Co., supra; Gumpert v. United States, 296 F.2d 927, 928–929, 155 Ct.Cl. 721, 723–726 (1961); McGowan v. United States, 296 F.2d 252 (C.A. 5, 1961); United States v. Spokane Rodeo, Inc., 254 F.2d 377 (C.A. 9, 1958); Royce v. Squire, 168 F.2d 250, 251 (C.A. 9, 1948). With that result we of course agree.

The Third Circuit's ruling in Sharp & Dohme, Inc. v. United States, 144 F.2d 456 (C.A. 3, 1944), though close, does not conflict with our view. The dividend tax in that case was imposed upon the stockholder, but was to be withheld by the paying corporation. National Industrial Recovery Act, 48 Stat. 195, 206. The stockholders could undoubtedly seek a refund themselves. But the court held the company (the withholding agent) unable to sue for any tax as to which it had not been given a consent before the expiration of the limitations period. This holding was founded, in

---

3. Since this taxpayer absorbed some of the taxes, it clearly has a right to a determination on the merits, whatever the customers do. The court will not find itself in the position of deciding the case in plaintiff's favor but being unable to order recovery because no consents can be obtained. In addition, plaintiff alleged in its petition that it stood ready to obtain and submit the necessary consents; the defendant's answer denied this allegation but no attempt was made to show that plaintiff could not obtain at least one consent.

substantial part, on the withholding agent's lack of any basic personal interest, since it was a mere collector. The tax in our case, on the other hand, was imposed on the manufacturer (the plaintiff) which alone can sue for refund (Dow Jones & Co. v. United States, 130 Ct.Cl. 696, 698, 128 F.Supp. 748, 750 (1955)). As the taxpayer, plaintiff has the direct personal interest lacking in Sharp & Dohme, Inc. Moreover, that decision was handed down long before the Commissioner of Internal Revenue interpreted the refund provisions of the Code to permit consents to be filed after limitations has run. That later administrative exposition has significantly changed the legal climate.

## II

In defending on the merits, the Government invokes a set of simple propositions: Since the taxpayer concedes that its equipment is a "business machine" under Section 3406(a) (6) of the 1939 Code and Section 4191 of the 1954 Code, the consequence must be that the tax was properly imposed, that there was no overpayment, and that no refund can be had; moreover, this taxpayer cannot rely on the erroneous private ruling given in April 1955 to Remington Rand, a separate taxpayer, and similarly the Government is not bound, in its relations with this taxpayer, by that incorrect *ad hoc* interpretation. The leitmotif of this defense is that taxpayers can never avoid liability for a proper tax by showing that others have been treated generously, leniently, or erroneously by the Internal Revenue Service—each individual must rest, in every instance, on the validity of his own position, under the applicable taxing provision, independently of the others'.

Though our tax law often takes that stance (see, e. g., Hanover Bank v. Commissioner of Internal Revenue, 369 U.S. 672, 686, 82 S.Ct. 1080, 8 L.Ed.2d 187

(1962))), the rule is not universal. Congress can direct the Service and the courts to take account, in a specified area, of discrimination, of equality of treatment, and of the tax burdens imposed on competitors or persons in the same or a comparable situation. Where that is what Congress has declared, the policy of the tax law emphasizes, in that particular sector more than in the rest of the tax field, the component of equal treatment; courts are then bound to vindicate that special interest just as they are, generally, to see that the uniform taxes Congress has sought to levy are paid. Curbing tax collection in the interest of equality, where Congress has so decreed, is as much a part of the internal revenue laws as the affirmative exaction of taxes. As Judge Learned Hand said in a similar connection, "the notion that the 'policy of a statute' does not inhere as much in its limitations as in its affirmations, is untenable." Borella v. Borden Co., 145 F.2d 63, 65 (C.A. 2, 1944), aff'd, 325 U.S. 679, 65 S.Ct. 1223, 89 L.Ed. 1865 (1945).[4]

With respect to Internal Revenue Service rulings and regulations, the Congressional mandate does direct administrative and judicial attention to this factor of equality (among others). Section 7805(b) of the 1954 Code provides:

"(b) *Retroactivity of regulations or rulings.*—The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect."[5]

This section has three signal consequences for those who seek rulings from the Service. Implicit in the permission to make tax rulings prospective is Congressional authorization not to collect taxes, for the past period, which would otherwise be required by substantive taxing provisions of the internal revenue legis-

---

4. The impact of statutes of limitations is another example of a Congressional policy cutting across the general policy of collecting the taxes demanded by the tax-

imposing provisions of the Code. See, also, footnote 6, infra.

5. There was a comparable provision in Section 3791(b) of the 1939 Code.

lation. If a ruling is or should be prospective only, the past tax can no longer be said to be validly imposed even though, by itself, it falls squarely under the coverage of some tax-imposing section of the Code. For reasons of fairness, Congress has, in effect, granted a dispensation from the amount otherwise due. The tax is no longer one "imposed by the internal revenue laws" which the Service is required to "collect" under Section 6301 of the 1954 Code. Conversely, to the extent the amount of the tax has already been collected, it becomes an "overpayment" (under Section 6402 (a)) which is subject to refund, despite the terms of the tax-imposing provision.[6]

■ Implicit, too, in the Congressional award of discretion to the Service, through Section 7805(b), is the power as well as the obligation to consider the totality of the circumstances surrounding the handing down of a ruling—including the comparative or differential effect on the other taxpayers in the same class. "The Commissioner cannot tax one and not tax another without some rational basis for the difference." United States v. Kaiser, 363 U.S. 299, 308, 80 S.Ct. 1204, 1210, 4 L.Ed.2d 1233 (1960) (Frankfurter, J., concurring). This factor has come to be recognized as central to the administration of the section. See Automobile Club of Michigan v. Commissioner of Internal Revenue, 353 U.S. 180, 185–186, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957); Exchange Parts Co. v. United States, 279 F.2d 251, 254, 150 Ct.Cl. 538, 543 (1960); Connecticut Ry. & Lighting Co. v. United States, 142 F. Supp. 907, 908–909, 135 Ct.Cl. 650, 653–654 (1956); Wolinsky v. United States, 271 F.2d 865, 868 (C.A. 2, 1959); Weller v. Commissioner of Internal Revenue, 270 F.2d 294, 299 (C.A. 3, 1959), cert. denied, 364 U.S. 908, 81 S.Ct. 269, 52 L.Ed.2d 223 (1960); Goodstein v. Commissioner of Internal Revenue, 267 F.2d 127, 132 (C.A. 1, 1959); City Loan & Savings Co. v. United States, 177 F.Supp. 843, 851

(N.D.Ohio, 1959), aff'd, 287 F.2d 612, 616 (C.A. 6, 1961). Equality of treatment is so dominant in our understanding of justice that discretion, where it is allowed a role, must pay the strictest heed.

■ The third principle inherent in Section 7805(b) is that the Commissioner's exercise of discretion is reviewable (in a proper proceeding) for abuse, in the same way as other discretionary administrative determinations. The Internal Revenue Service does not have *carte blanche*. Its choice must be a rational one, supported by relevant considerations. See Automobile Club of Michigan v. Commissioner of Internal Revenue and the other cases cited supra; Lesavoy Foundation v. Commissioner of Internal Revenue, 238 F.2d 589 (C.A. 3, 1956); Goodstein v. Commissioner of Internal Revenue, supra; Lynn and Gerson, Quasi-Estoppel and Abuse of Discretion as Applied Against the United States in Federal Tax Controversies, 19 Tax L.Rev. 487, 509 ff. (1964).

■ It is plain that Section 7805 (b), embodying these principles, governs plaintiff's case. The Commissioner's letter of November 26, 1957, denying the request for exemption of Type 604 computers, was a "ruling", "relating to the internal revenue laws", to which this Code provision applied. Plaintiff had sought, by its letter of July 13, 1955, an "immediate ruling" on the status of the equipment; the Service was asked to "rule on" that question, in light of the fact "that your Office recently *ruled* that the same types of machines produced by Remington Rand, Inc. are not subject to the Manufacturers' Excise Tax" (emphasis added). The answer of the Service, in November 1957, referred to the taxpayer's letter "wherein a *ruling* is requested relative to the taxability" of the machines, and to IBM's feeling "that we should issue a specific *ruling* regarding the taxability of these machines of its manufacture" (emphasis added). The

---

6. One analogy is Section 1108(b) of the Revenue Act of 1926, infra, fn. 10. The statute of limitations is another.

response then goes on to issue such a ruling, negative in character but still a ruling. The operation of Section 7805(b) is not limited, either by its terms or its history,[7] to Service rulings granting exemptions from taxation or acceding to the applicant's request. Like a judicial decision adverse to a party, a ruling against the taxpayer is nevertheless a ruling. Similarly, a published ruling is not the only type of "ruling" within Section 7805 (b); a private ruling is clearly included in the general category of "*any* ruling or regulation, relating to the internal revenue laws" (emphasis added).

■ We must thus decide whether the Commissioner of Internal Revenue abused his discretion, under Section 7805(b), when he insisted that, as to this taxpayer, his ruling of November 1957 that the computers were taxable should be retroactive rather than prospective. When we examine the agreed facts, we cannot escape holding that there was a clear abuse, that the circumstances compelled the Service to confine its ruling (when it was finally given) to the future period for which Remington Rand's computers were to be held taxable. Every material vector, as we gauge them, points to that resolution.

Here were the two competitors in the field of large electronic computing systems.[8] The ten percent "business machines" tax, normally passed on to the purchaser or lessee, was obviously a significant element in sales and leases. Prior to April 1955, both companies paid that tax. Remington obtained an exemption in the middle of April 1955, and this exemption continued until February 1, 1958. Shortly after learning of this ruling, IBM sought (in July 1955) an "immediate ruling" to the same effect for its identical equipment; its request was marked "*Urgent! Please Expedite*", and the last paragraph referred to "the extreme urgency of this matter." Since the competing machines had already been freed from the tax, the Internal Revenue Service could not help but know that each month it lagged in responding to plaintiff would likely work a serious commercial detriment.[9] Nevertheless, the Service waited almost two and one-half years before it rejected IBM's request, and two months more before it made Remington's competing equipment taxable for the future. Meanwhile, IBM continued to pay the tax, as it was required to do under the law, while Remington's disposal of its devices was tax-free. The Service must have known, too, that it could not ultimately equalize the burdens of the two competitors by requiring Remington to pay the tax for the past period. Under Section 1108(b) of the Revenue Act of 1926, 44 Stat. 9, 114,[10] that manufacturer

---

7. IBM has collected, in an appendix to its brief, a number of Service rulings, adverse to the claim of taxpayers, in which the Commissioner has invoked Section 7805(b) (or its predecessor) to make the ruling prospective only.

8. Though the record is not conclusive, we infer that, at the time, IBM and Remington Rand were the only two competitors as to the type of devices involved in the Service's rulings. The Service seems to have then considered them the only two competitors (see finding 13). At the least, they were by far the major competitors; the business of other companies was so much smaller that it can appropriately be disregarded. IBM's business was much greater than Remington's, but in absolute figures the latter had a substantial share of the market.

9. The Service's letters to Remington and IBM in November and December 1957, holding that the equipment fell under the "business machines" tax, show clearly that the Government understood all along that the two companies were the interested competitors.

10. "No tax shall be levied, assessed, or collected * * * on any article sold or leased by the manufacturer, * * * if at the time of the sale or lease there was an existing ruling, regulation, or Treasury decision holding that the sale or lease of such article was not taxable, and the manufacturer * * * parted with possession or ownership of such article, relying upon the ruling, regulation, or Treasury decision."

was exempted by statute from ever having to pay the tax for all the time the Service left unrevoked its telegraphic ruling of April 15, 1955, exonerating Remington computers. See Cory Corp. v. Sauber, 363 U.S. 709, 717, 80 S.Ct. 1331, 4 L.Ed.2d 1508 (1960) (dissent). The Service even heightened the potential injury by voluntarily refunding to Remington (in July 1956) almost $87,000 in excise taxes paid on the competing Univac systems from January 1, 1952 to April 30, 1955—a period of over three years before Remington received its private ruling in April 1955 and for that reason a period as to which Section 1108(b) of the 1926 Revenue Act, supra, would not control.

Only at the end of November 1957, did the Service tell plaintiff—without any preliminary word—that its application for a ruling of non-coverage was rejected and its machines would be held taxable for the past as well as the future. The treatment of Remington was quite different. On May 1, 1957, over half-a-year before the answer to plaintiff's request, the competitor was informed that the Service had reconsidered the telegraphic ruling of April 15, 1955, and had already concluded that "electronic calculating or computing equipment used in solving business, scientific and engineering problems" was taxable. At that time the Service told Remington that it proposed to revoke its telegraphic ruling *"and to make such revocation prospective only. However, we will withhold further action on the matter for a period of thirty days from the date of this letter in order to afford you an opportunity, should you so desire, of submitting a protest or requesting a hearing in the case"* (emphasis added). Thirty days later (May 31, 1957), Remington accepted the invitation and requested a conference during the week of June 24, 1957. This was held on June 25, 1957, and, another month later (July 25, 1957), Remington presented a letter on its position, emphasizing the inequity of making the proposed ruling retroactive. The Service did not actually revoke the Remington private ruling until another four months had gone by, on December 3, 1957, and even then did not make the revocation effective until February 1, 1958. This was nine months after the Service had first told Remington (on May 1, 1957) that it had decided that the telegraphic ruling of April 1955 was erroneous. The result of this new and prospective ruling was that Remington had to pay the tax only after February 1, 1958; it was wholly free of the excise from January 1, 1952, to that date, a span of over six years. Much of this time was taken up by the Service's unexplained tardiness (July 1955–May 1957) in reconsidering the issue of taxability. The additional delay, from May 1957 to February 1958, in effectuating the new ruling necessarily extended Remington's period of freedom-from-tax, under Section 1108(b) of the 1926 Revenue Act, supra, fn. 10; and the Service's election to make the ruling wholly prospective further increased that company's competitive advantage.[11] In contrast, the Government has demanded that the plaintiff pay the tax on sales or leases of its identical (and competing) equipment for the entire period.

This imbalance is in no way assignable to plaintiff. It promptly tried to obtain the same treatment as Remington, stressing the urgency of its request. The Service's long delay, the defendant says, should nevertheless be pinned on IBM's failure to prod—but taxpayers, once they have initiated a request, have no obligation to harry or push the Government into action. There can be no serious contention that the plaintiff withheld any pertinent material; the Service

---

11. Section 1108(b) barred the collection of back taxes for the period during which the private ruling was outstanding, but that statute did not prevent the recovery of the taxes for January 1, 1952–April 1955 which the Service had voluntarily refunded (in July 1956) to Remington. Since re-collection was not yet barred by limitations, these amounts could have been recouped if the Service had not made its new ruling prospective only.

asked for nothing more than IBM supplied and what it supplied was at least as informative and as extensive as that on which Remington received a favorable ruling in April 1955.[12] Nor should the plaintiff be chided because it coupled with its petition for non-discriminatory treatment the formal claim that the equipment was not taxable. The Service had already so ruled in favor of the competitor, and in such circumstances a taxpayer cannot be convicted for taking the taxing authorities at their word. The Service, for its part, cannot have been misled by this argument and it is obviously in no position to complain that the point spurred it to reconsider the private ruling given to Remington. No part of the extended and unsupported delay, leading to a drastic inequality, was attributable to the plaintiff.

 This history exposes a manifest and unjustifiable discrimination against the taxpayer. We do not say, we need not say, that the differential treatment was deliberate or malevolent. It is enough that the direct result of the Service's course-of-conduct, though inadvertent and unplanned, was to favor the other competitor so sharply that fairness called upon the Commissioner, if he could under Section 7805(b), to establish a greater measure of equality. For all tax rulings, it is important that there be like treatment to those who should be dealt with on the same basis. Automobile Club of Michigan v. Commissioner of Internal Revenue, supra, 353 U.S. at 186, 77 S.Ct. 707, 1 L.Ed.2d 746 and other cases cited supra at p. 920 of 343 F.2d. Parity in the levying of manufacturers' excises is peculiarly essential to free and fair competition. See Exchange Parts Co. v. United States, supra, 279 F.2d at 253, 150 Ct.Cl. at 541; H.Rept. No. 708, 72d Cong., 1st Sess., pp. 31, 32 (1932). The gap here in the imposition of the "business machines" tax was so large that the Commissioner could not choose to

ignore it if an appropriate remedy was at hand.

Once the Commissioner determined to deal with Remington in the way he did, the means of equalization were apparent on the face of Section 7805(b) which empowered him "to limit retroactive application to the extent necessary to avoid inequitable results." Automobile Club of Michigan v. Commissioner of Internal Revenue, supra, 353 U.S. at 184, 77 S.Ct. at 710. If he were not to abuse his discretion, the Commissioner was compelled to decide that the ruling given to IBM should be "applied without retroactive effect" so as to place the two competitors on the same plane. Since Remington was being freed of the tax from January 1, 1952, to February 1, 1958, the plaintiff, too, should have been accorded that dispensation. The Service has often announced that rulings imposing or confirming a tax will not be applied retroactively.[13] Many, but not all (see fn. 13), have concerned departures from prior published rulings, but nothing in Section 7805(b) limits the Commissioner's authority to that particular area. If, as in this instance, other elements make non-retroactivity imperative, the statute calls for it. To opt for retroactivity where the opposite is required is an abuse of the discretion granted by the section.

 The omission of the Service to do what it was compelled by the circumstances to do leads inevitably to IBM's recovery of the taxes paid for the period from January 1, 1952, to February 1, 1958 (which are covered by timely refund claims). Cf. Lesavoy Foundation v. Commissioner of Internal Revenue, supra, 238 F.2d 589 (C.A. 3, 1956). The failure to make the ruling of taxability, given in November 1957, prospective from February 1st was void and erroneous because contrary to the innate requirements of Section 7805(b). Under the statute that ruling had to be prospec-

12. The one document the defendant mentions as missing was a very short statement containing nothing of any relevance which was not already known to the Service.

13. Plaintiff cites over forty such instances from the published rulings of 1955–1962. Several of these appear to base non-retroactivity on prior private rulings.

tive. It must therefore be treated as such, in the same fashion that a court, disregarding an erroneous administrative determination in the ordinary refund suit, proceeds to vindicate the requirements of the statute (or regulation). On two occasions (Connecticut Ry. & Lighting Co. v. United States, 142 F.Supp. 907, 135 Ct.Cl. 650 (1956), and Exchange Parts Co. v. United States, 279 F.2d 251, 150 Ct.Cl. 538 (1960)) this court has allowed recovery of back taxes where the Commissioner of Internal Revenue discriminated against a taxpayer by wrongly applying the retroactive features of a ruling. Those cases involved an invalid distinction between taxpayers who had and those who had not paid the disputed tax, but the broader principle of the decisions is that a refund suit lies for the past period whenever the Service has improperly made its ruling retroactive as to the suing taxpayer.[14] We know of no holding opposed. The numerous cases saying that one taxpayer has no right to rely on an incorrect private ruling to another[15] are irrelevant; they concerned, not the discretion of the Commissioner under Section 7805(b) where the suing taxpayer has himself asked for a ruling, but instances in which the taxpayer simply claimed freedom from the tax on the basis of a private ruling to a separate person. We need not, and do not, depart from that settled principle since we do not decide this case on the ground that IBM had a right to invoke or rely upon Remington's private ruling of April 1955. We rest on the wholly different basis that IBM, having taken the pains to ask promptly for its own ruling, was entitled to have the Service's ruling, in response to that request, controlled by the standard of equality and fairness incorporated in Section 7805(b).

Plaintiff's statutory right to this type of equal protection is not cut off by its omission to prove that it lost business by virtue of the discriminatory treatment. The inequality inheres in the payment of the tax by IBM and its customers while Remington and its customers were allowed to go free. The injury lies in the collection of taxes which are now found not to have been collectible. No more than in the normal refund case must plaintiff show, in this suit to enforce Section 7805(b), any injury or detriment other than the payment of a tax which the Government should not retain. The Code does not demand any special or greater proof of harm as a condition of recovery for an abuse of discretion

14. In those instances the court assumed or held that (a) the substantive position on taxability announced in the ruling was correct and (b) the Service could have made the ruling retroactive for all taxpayers (the latter was explicitly true of *Exchange Parts*).

Where the Service has discriminated in its ultimate ruling of taxability, *Exchange Parts* is direct authority for granting a refund to a taxpayer for a period in which he did not have any ruling in his favor either public or private. The court allowed recovery for just such a period before any ruling of non-taxability had been published and before that taxpayer had obtained private rulings—a period during which, by hypothesis, the tax was properly owing. On that point, *Exchange Parts* is on all fours with the present case.

15. See Hanover Bank v. Commissioner of Internal Revenue, 369 U.S. 672, 686, 82 S.Ct. 1080, 8 L.Ed.2d 187 (1962); Wel-ler v. Commissioner of Internal Revenue, 270 F.2d 294, 299 (C.A. 3, 1959), cert. denied, 364 U.S. 908, 81 S.Ct. 269, 5 L.Ed.2d 223 (1960); Goodstein v. Commissioner of Internal Revenue, 267 F.2d 127, 132 (C.A. 1, 1959); State Farm Mutual Automobile Ins. Co. v. United States, 314 F.2d 363, 368 (C.A. 7), cert. denied, 375 U.S. 835, 84 S.Ct. 59, 11 L.Ed.2d 65 (1963); Pomeroy Cooperative Grain Co. v. Commissioner of Internal Revenue, 288 F.2d 326, 330 (C.A. 8, 1961); Wood v. Commissioner of Internal Revenue, 39 T.C. 1, 7 (1962); Gerstell v. Commissioner of Internal Revenue decided July 30, 1962, P. H. Memo., T.C., par. 62, 181, aff'd per curiam, 319 F.2d 131 (C.A. 3), cert. denied, 375 U.S. 941, 84 S.Ct. 347, 11 L.Ed.2d 273 (1963); Bennett v. Commissioner of Internal Revenue, decided Nov. 20, 1960, P. H. Memo., T.C., par. 60,253; Minchin v. Commissioner of Internal Revenue, 335 F.2d 30, 32–33 (C.A. 2, 1964).

under Section 7805(b).[16] The goal of that provision, when it applies, is to outlaw "inequitable results" in taxation (Automobile Club of Michigan v. Commissioner of Internal Revenue, supra), not merely to compensate for an additional injury over and above the unequal levying of the tax. It would weaken and dilute the standard of equality Congress put into the section to add the gloss that, even though the Service violated the statute, the taxpayer is without remedy unless he proves that he lost business or competitive position.[17] The taxpayer's claim is founded on a right granted by Congress, not merely on principles of estoppel evolved judicially as part of a limited "common law" effort to further fairness. In Connecticut Ry. & Lighting Co. and Exchange Parts, supra (see footnote 14), there was no proof of any special loss, and for part of the period involved in Exchange Parts there was no showing of reliance on any Internal Revenue Service ruling or position.

For these reasons, the plaintiff is entitled to recover, subject to the showing called for by Part I, supra, the manufacturers' excise taxes paid by it, on its Type 604 computing systems, during the period from January 1, 1952, through January 31, 1958. Judgment is entered to that effect. The amount of recovery will be determined under Rule 47(c).

COWEN, Chief Judge (dissenting).

If we were empowered, in accordance with the dictates of natural justice, to order that the taxes paid by plaintiff be refunded because plaintiff received unfair and unequal treatment, I would readily concur in the court's decision. Despite the persuasiveness of the court's opinion, however, I would dismiss plaintiff's petition. In my view, the court's decision is contrary to the intention of Congress as expressed in the enactment of the statute upon which the court's action is predicated and departs from the rule announced in decisions which have construed that statute in actions by taxpayers who based their suits upon private rulings issued to other taxpayers. As a preliminary to the conclusion which I believe should have been reached in this case, let us review the salient facts.

First, it is undisputed and now conceded by plaintiff that the business machines, which are the subject of its suit for refund, were at all times pertinent to this action subject to the excise tax provided in Section 4191 of the Internal Revenue Code of 1954, or its predecessor.

Second, on July 13, 1955, plaintiff applied for a private ruling that its machines were not taxable on the ground that the Commissioner of Internal Revenue had, on April 15, 1955, issued a private ruling to Remington Rand that its computing machines, which were similar in all material respects to plaintiff's machines, were not subject to the excise tax. The ruling in favor of Remington Rand was revoked December 3, 1957, but, as to it, the new ruling was made applicable only for the period beginning on and after February 1, 1958. On November 26, 1957, the Commissioner, in response to plaintiff's request for a private ruling, notified plaintiff that its machines were taxable. There was no retroactive application of a private ruling issued to plaintiff or of a published ruling covering its machines.

Third, there is no evidence in the record that plaintiff closed any transactions in reliance on the private ruling given to Remington Rand, or that it suffered any competitive disadvantage as a result of the Commissioner's action.

The court recognizes that when the Internal Revenue Service revoked the pri-

---

16. Aside from the requirements considered in Part I of this opinion.

17. Moreover, if that were the rule, the court would presumably have to consider the position of the various customers who ultimately bore the tax and will benefit from the refund.

We also note that, when the Service makes its rulings prospective, it does not seem to have insisted that taxpayers, in order to benefit from this prospectivity, show that they have individually relied to their detriment on previous rulings or positions of the Service.

vate ruling given to Rand, it could not apply the ruling of revocation to Remington Rand retroactively because of the provisions of Section 1108(b) of the Revenue Act of 1926 (quoted in footnote 10 of the court's opinion). There is no corresponding statutory provision which would have authorized the Commissioner of Internal Revenue to forgive the tax on plaintiff's sales during the period that the erroneous ruling to Remington Rand was outstanding. Nevertheless, the court holds that the Commissioner abused the discretion reposed in him by Section 7805 (b) of the Internal Revenue Code of 1954, when he failed to apply the ruling given to plaintiff (that its machines were taxable) without retroactive effect so that both competitors would be placed on the same plane.[1]

The predecessor of Section 7805(b) was first enacted in substantially its present form as Section 506 of the Revenue Act of 1934, which amended Section 1108 (a) of the Revenue Act of 1926. The purposes for which the new Section 506 was enacted are set forth in substantially the same language in both H.Rep. No. 704, 73d Cong., 2d Sess., at page 38 and S.Rep.No.558, 73d Cong., 2d Sess., at page 48.

The House Report reads as follows:

"Section 506. Retroactivity of rulings: This section amends section 1108(a) of the Revenue Act of 1926, as amended, so as to permit the Secretary, or the Commissioner with the approval of the Secretary, to prescribe the extent, if any, to which any regulation, Treasury decision, or ruling relating to internal revenue taxes shall be applied without retroactive effect. The amendment extends the right granted by existing law to the Treasury Department to give regulations and Treasury decisions amending prior regulations or Treasury decisions prospective effect only, by allowing the Sec-

retary, or the Commissioner with the approval of the Secretary, to prescribe the exact extent to which any regulation or Treasury decision, whether or not it amends a prior regulation or Treasury decision, will be applied without retroactive effect. The amendment furthermore permits internal revenue rulings as well as regulations or Treasury decisions to be applied without retroactive effect. Regulations, Treasury decisions, and rulings which are merely interpretive of the statute, will normally have a universal application, *but in some cases the application of regulations, Treasury decisions, and rulings to past transactions which have been closed by taxpayers in reliance upon existing practice, will work such inequitable results that it is believed desirable to lodge in the Treasury Department the power to avoid these results by applying certain regulations, Treasury decisions, and rulings with prospective effect only.*" [Cum.Bull. 1939–1 (Part 2) p. 583] [Emphasis added]

From the above-quoted language in the House Report, it seems altogether clear that Congress vested the Commissioner with the discretion to limit the retroactive application of any ruling, regulation, or Treasury decision when necessary to avoid inequities to taxpayers who have acted to their detriment in relying upon prior decisions, regulations, or rulings. Therefore, in my opinion, a showing of detriment and reliance is generally necessary to establish an abuse of discretion under Section 7805(b). See Lynn and Gerson Quasi-Estoppel and Abuse of Discretion as Applied Against the United States in Federal Tax Controversies, 19 Tax L.Rev. 487, 508 (1964). As stated above, plaintiff did not show that it closed any transactions in reliance on the private ruling given to Remington Rand, or that it suffered any competitive disadvantage as a result of the ruling. At a

---

1. The majority places the "competitors" on the same plane retrospectively, but it does so without regard to whether any

competitive disadvantage was suffered by plaintiff.

pretrial conference held before our trial commissioner (para. 16 Commissioner's Memorandum of Pretrial Conference) defendant put plaintiff on notice that if its right to recover was predicated upon an alleged competitive disadvantage inflicted upon it by the Commissioner of Internal Revenue, plaintiff could support its claim only by producing evidence of sales opportunities lost because excise taxes were imposed on its machines but not upon those of Remington Rand. Plaintiff did not offer any proof on the point. Also, plaintiff did not absorb any of the excise taxes on the machines sold or leased to its customers.[2]

In a series of decisions by the First Circuit, the Third Circuit and the Tax Court, the courts were faced with actions by taxpayers, who had not received private rulings from the Internal Revenue Service. They argued that when the Commissioner revoked a previous letter ruling issued to another taxpayer, the retroactive application of that change in position as to them constituted a discriminatory abuse of the discretion granted by Section 7805(b) or its predecessor. Insofar as taxability was concerned, the situation of these taxpayers was the same or similar to that of the taxpayer who had received the ruling, and it was shown or assumed that the plaintiffs in each case had relied on the previous rulings. Weller v. Commissioner, 270 F.2d 294 (3d Cir. 1959), cert. denied, 364 U.S. 908, 81 S.Ct. 269, 5 L.Ed.2d 223; Estate of Bennett v. Commissioner of Internal Revenue, P.H. Memo. T.C. Para. 60253 (1960); Gerstell v. Commissioner of Internal Revenue, P.H. Memo. T.C. Para. 62181 (1962), Aff'd 319 F.2d 131 (3d Cir. 1963); Goodstein v. Commissioner of Internal Revenue, 267 F.2d 127 (1st Cir. 1959). In each case, the court held that the issuance of a ruling to a particular taxpayer was a sufficient basis for the Commissioner, in the exercise of his discretion, to apply the change in position retroactively as to taxpayers who had not received rulings. Thus, in Weller, the Third Circuit stated:

"Petitioners contend, however, that although the revenue ruling fails to indicate any limitation on its application, agents of the Treasury have stated to Congress that it does not intend to apply the revenue ruling retroactively to individuals who have previously been issued rulings. We need not determine whether such action if carried out would be an abuse of discretion, for *petitioners are not in the same position as those parties who have been issued rulings. They are entitled to the same treatment as all other taxpayers similarly situated, i. e., without rulings,* no more and no less. This the Commissioner has afforded them." [Emphasis added]

The Third Circuit adhered to this rule in its affirmance of the Tax Court's decision in Gerstell v. Commissioner, supra, and in Carpenter v. Commissioner of Internal Revenue, 322 F.2d 733 (1963).

The First Circuit reached the same conclusion in Goodstein v. Commissioner of Internal Revenue, supra, and pointed out an additional basis therefor in the following language:

"But to hold that the Commissioner is bound by rulings specifically addressed to a taxpayer other than the one whose return is questioned would severely limit the usefulness of the long established practice of private administrative rulings. * * * We are of the opinion that the Tax Court was correct in holding that insofar as * * * no individual ruling to the contrary was ever issued to the taxpayer, he cannot now assert that the Commissioner committed error in his retroactive application of the published ruling."

---

2. Of the total amount plaintiff seeks to recover, $251,797.45 represents taxes imposed on plaintiff's own use of its machines and $11,123,292.55 represents excise taxes passed on to its customers who purchased or rented plaintiff's machines.

I see no distinction in principle between the facts in the case before us and those in the cases cited and I would, therefore, follow the rule which they have announced.

As the First Circuit has suggested, I believe that the court's holding in this case might impair the usefulness of the long established and well-known policy of the Internal Revenue Service with respect to private rulings. The reasons for that policy inhere in the great number of such rulings which are issued yearly and the circumstances under which they are issued. The policy was first announced in 1954 in Rev.Rul. 54–172, 1954–1, Cum. Bull. 394, Section 11, and is now set forth in Treasury Regulation 601.201. Thus, it has long been the policy and it is now stated in the regulations that the Service will not, except in unusual cases, apply the revocation or modification of a ruling issued to a particular taxpayer in a retroactive way. The basis for this policy has been discussed fully and will not be repeated here. Wenchel, Taxpayers Rulings, 5 Tax L.Rev. 105 (1950) and Caplin, Taxpayer Rulings Policy of the Internal Revenue Service: A Statement of Principles, N.Y.U. 20th Inst. on Fed.Tax. 1, 26–29 (1962).

Congress has considered this problem and has demonstrated its reluctance to change or restrict the established Service policy regarding private rulings by rejecting a proposed amendment to Section 7805 of the Internal Revenue Code of 1954. The amendment provided that a taxpayer who files a tax return in reliance on an unpublished ruling issued to another taxpayer, should be treated in the same manner as if the unpublished ruling had been issued to him, provided the ruling had not been revoked by the time the return was filed. 102 Cong.Rec. 14,-

682 (1956). The Senate adopted the proposed amendment but it was never acted on by the House.

As I understand, the court's decision is principally based on the decisions of this court in Exchange Parts Company, Inc. v. United States, 279 F.2d 251, 150 Ct.Cl. 538 (1960) and Connecticut Railway & Lighting Co. v. United States, 142 F.Supp. 907, 135 Ct.Cl. 650 (1956).[3] I think that the facts in those cases are dissimilar and that the decisions do not control this case. In Connecticut Railway, the Internal Revenue Service published regulations which reversed a consistent administrative practice extending over a period of 30 years, as well as the government's published representations to the Supreme Court. In Exchange Parts Company, Inc., plaintiff was one of many businesses engaged in rebuilding automobile parts. After paying the excise tax on rebuilt equipment for several years, plaintiff applied for and obtained a ruling that the articles were not taxable. In addition, there were published rulings to the same effect. Thereafter, the Commissioner reversed his position but stated that in view of his earlier published pronouncements, he would apply the new ruling prospectively, except that he would not refund any excise taxes that had been previously paid. Plaintiff's claim for refund, which covered the period for which it had paid the taxes, was rejected.

The distinguishing feature of both cases is that by virtue of private and published rulings or long standing administrative practice, each of the affected taxpayers would have been entitled to a refund of the taxes paid under the law as it had been administered by the Internal Revenue Service. The court held that in such circumstances it was an abuse of discretion for the Commissioner to discriminate against the plaintiffs in those

3. In Connecticut Railway and Exchange Parts Company, the briefs of the parties did not contain any reference to or discussion of Section 1108(b) of the Revenue Act of 1926 and there is no indication in the court's opinions that this statute was noticed or considered.

cases solely on the basis that they had paid the taxes in suit.

The plaintiff's situation here is quite different. It applied for but did not obtain a ruling that its machines were nontaxable. The erroneous ruling issued to Remington Rand was a private ruling which covered only its machines, designated by name and number. There was no published ruling of general applicability nor was there a long standing and publicly announced administrative practice that the type of machines manufactured by plaintiff were not subject to the excise tax. The fact that plaintiff's machines were similar in all respects to those made by Remington Rand does not place plaintiff in any better position than the plaintiffs in the Weller-Goodstein line of cases cited above.

Upon the facts presented to us, the long delay which elapsed between plaintiff's application for a favorable ruling and the revocation of the ruling given to Remington Rand appears to have been inexcusable. The explanation offered by defendant is neither appealing nor convincing. But this is a problem of administrative management in the Internal Revenue Service and its correction should come through reforms initiated in that agency. If relief is to be granted for the kind of damage claimed by plaintiff, such relief should be provided by legislation [4] rather than by a remission of taxes lawfully due.

Equal treatment of all taxpayers who are similarly situated is a much sought-after goal. This case is an example—a deplorable example—of the fact that in many cases the goal is not attained. However, in the absence of some statutory provision which affords plaintiff relief because of the unequal treatment it received, I think the court is powerless to supply the remedy it has applied in this case.

4. Congress has denied consent to sue the sovereign in tort actions for damages predicated on an abuse of discretion. 28 U.S.C. 2680(a); see Jayson, Application of the Discretionary Function Exception, 24 Fed.Bar J. 153 (1964).