**SIRBO HOLDINGS, INC., Appellant,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 209, Docket 74–1697.**

United States Court of Appeals, Second Circuit.

Argued Dec. 16, 1974.

Decided Jan. 14, 1975.

James R. McGowan, Providence, R. I. (Lester H. Salter and Salter, McGowan, Arcaro & Swartz, Providence, R. I., of counsel), for appellant.

Ernest J. Brown, Dept. of Justice, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., and Gilbert E. Andrews, Dept. of Justice, Washington, D. C., of counsel), for appellee.

Before FRIENDLY, TIMBERS and GURFEIN, Circuit Judges.

FRIENDLY, Circuit Judge:

When this case was here before, 476 F.2d 981 (2 Cir. 1973),[1] on appeal from an earlier decision of Judge Quealy, Sirbo Holdings, Inc., 57 T.C. 530 (1972), we vacated the judgment and remanded the cause to the Tax Court for reconsideration. We were disturbed at the Tax Court's refusal to treat the payment of $125,000 received by petitioner Sirbo Holdings, Inc. (Sirbo), from its tenant Columbia Broadcasting System, Inc. (CBS), in satisfaction of the latter's obligation to restore, or indemnify Sirbo for the costs of restoring, the leased premises to their pre-lease condition as a long-term capital gain from the sale or exchange of property used in the landlord's trade or business, I.R.C. § 1231, when, in what appeared to be a considered opinion, Judge Raum had allowed such treatment in a similar case decided only two months later, Boston Fish Market Corp., 57 T.C. 884 (1972), or even to explain the differences in result when Sirbo sought reconsideration. Thinking that the Tax Court's lack of response to Sirbo's petition might have been due to deference to dicta in Billy Rose's Diamond Horseshoe, Inc. v. United States, 448 F.2d 549, 551–552 (2 Cir.), aff'g 322 F.Supp. 76 (S.D.N.Y.1971), which held that a similar transaction involving a series of payments did not qualify for special relief treatment under the installment reporting method of I.R.C. § 453(a)(1) & (b)(1) for "a casual sale or other casual disposition of personal property," we advanced some suggestions why that decision did not necessarily determine that the transaction here at issue was not a sale or exchange of property used in the trade or business, one of the tests applicable for capital gains treatment under I.R.C. § 1231(a), but we reserved the question of law pending "the benefit of the considered view of the Tax Court . . . on whether it would follow *Boston Fish Market* on the facts here." 476 F.2d at 989 (footnote omitted). In a supplemental opinion by Judge Quealy, 61 T.C. 723 (1974), reviewed by the full court, the Tax Court adhered to its earlier determination, and petitioner has again appealed.

■ We can now forget about *Boston Fish Market*. We had noted, 476 F.2d at 987, that in that case the Commissioner was primarily concerned with fending off the landlord's claim that the tenant's payment was not income at all under I.R.C. § 109, which excludes from a lessor's gross income the value upon termination of a lease of improvements made by the lessee, and had "abandoned his challenge to the propriety of capital gains treatment, see 57 T.C. at 887 n. 2". But there were statements in Judge Raum's opinion which we took as possibly meaning that the Tax Court thought

---

1. Our previous opinion states the facts; familiarity with it will be presumed.

that abandonment of the objection to capital gains treatment was required. See 57 T.C. at 889 (such payments "have generally been regarded as having been received in sale or exchange of the unrestored property."). The Commissioner now states that his acquiescence in capital gains treatment in *Boston Fish Market* was not considered policy but rather was an error, and the Tax Court says that "Without such concession, the *Boston Fish Market* case may well have been decided differently," 61 T.C. at 726 n. 4—which we take to be a way of saying "would have been decided differently." While even-handed treatment should be the Commissioner's goal, *cf.* International Business Machines Corp. v. United States, 343 F.2d 914, 170 Ct.Cl. 357 (1965), cert. denied, 382 U.S. 1028, 86 S.Ct. 647, 15 L.Ed.2d 540 (1966),[2] perfection in the administration of such vast responsibilities cannot be expected. See Davis, Administrative Law Treatise § 17.07, at 600 (1970 Supp.).[3] The making of an error in one case, if error it was, gives other taxpayers no right to its perpetuation. *See* Wagner v. United States, 387 F.2d 966, 968, 181 Ct.Cl. 807 (1967). *Cf.* Snowden v. Hughes, 321 U.S. 1, 15, 64 S.Ct. 397, 88 L.Ed. 497 (1944) (concurring opinion of Mr. Justice Frankfurter).

On the other hand, appellant Sirbo's arguments are quite persuasive in support of our intimation in our earlier opinion that the terms "a sale or other disposition of real property" and "a casual sale or other casual disposition of personal property" in I.R.C. § 453(b) are more restrictive than "sales or exchanges of property used in the trade or business" in I.R.C. § 1231(a). 476 F.2d at 988. The history and literature relevant to § 453(b) contain many references to contracts of sale and sales on the installment plan,[4] all indicating an intention to confine this benefit to conventional sales. Certainly § 1231(a) has been extended far beyond these. Further force is added on this point by the recent decision in Central Tablet Manufacturing Co. v. United States, 417 U.S. 673, 94 S.Ct. 2516, 41 L.Ed.2d 398 (1974), in which the Court noted that the Government, accepting decisions by the Court of Claims and the Fourth Circuit,[5] had properly conceded that an involuntary conversion constituted a "sale or exchange of property" within I.R.C. § 337(a), and as such was nonrecognized, although it had been

---

**2.** "For all tax rulings, it is important that there be like treatment to those who should be dealt with on the same basis." 343 F.2d at 923.

**3.** Speaking of the *IBM* decision, *supra*, Professor Davis remarks:

No one would disagree with the principle of equality which the IBM decision advances. The problem of the case is not whether equality is desirable; of course it is. The problem is how much deviation from complete equality must be allowed as a concession to the difficulties of administration. If one taxpayer gets a favorable but erroneous ruling on a specific question, equality requires that every other taxpayer having that same question be allowed the advantage of the error. But is that practical? Do even the best of tax administrators have the capacity to carry the equality principle all the way?

**4.** *See* H.R.Rep. No. 1, 69th Cong., 1st Sess. (1926), reprinted in Internal Revenue Bulletin, Cum.Bull. 1939–1 (Part 2) at 315, 346–47, where the drafters of § 212(d) of the Revenue Act of 1926, 44 Stat. 23, explained the necessity of "validating" the Commissioner's prior regulatory practices in recognizing an installment basis for reporting income. These practices had suffered setbacks before the Board of Tax Appeals, *see* Manomet Cranberry Co., 1 B.T.A. 706, 708 (1925); B.B. Todd, Inc., 1 B.T.A. 762, 767 (1925), and the drafters sought in § 212(d) to provide a statutory basis for the installment method. The section of the report dealing with this provision is entitled "Installment Sales" and it speaks in terms of "personal property sold on the installment plan," "installment sales," and other sales "on deferred payment plans." And see H.R.Rep. No. 356, 69th Cong., 1st Sess. (1926), reprinted in Internal Revenue Bulletin, Cum.Bull. 1939–1 (Part 2), at 361, 363; 2 Mertens, Law of Federal Income Taxation § 15.02 (1967) (history of installment sales provisions of the Code prior to 1954).

**5.** Towanda Textiles, Inc. v. United States, 180 F.Supp. 373, 149 Ct.Cl. 123 (1960); Kent Manufacturing Corp. v. CIR, 288 F.2d 812 (4 Cir. 1961).

held not to come within the then equivalent of I.R.C. § 1231(a), Helvering v. William Flaccus Oak Leather Co., 313 U.S. 247, 61 S.Ct. 878, 85 L.Ed. 1310 (1941), before that section was amended to include such a conversion. The concession, and the Court's approval of it, at least serve to show that, where the Internal Revenue Code is concerned, no controlling weight can be given to the usual presumption that, when the same words are used in several sections of a statute, they mean the same thing. Rather the Court will look at the Congressional history and purpose in each case.

With Sirbo thus deprived of the aid we thought it might get from *Boston Fish Market* and the Commissioner gaining little assistance from the decision as distinguished from the dicta in *Billy Rose*, we must decide the basic question whether Sirbo's receipt of the $125,000 payment came within I.R.C. § 1231(a). We hold that not all of it did and that, since Sirbo has twice failed to avail itself of an opportunity to proffer evidence that would support an allocation, the Tax Court should be affirmed.

The problem with respect to the tax treatment of payments for the termination of contract rights having a property flavor is among the most frustrating in income tax law. Anyone reading such materials as Professor Eustice's article, Contract Rights, Capital Gain, and Assignment of Income—the Ferrer Case, 20 Tax.L.Rev. 1 (1964), Professor Chirelstein's article, Capital Gain and the Sale of a Business Opportunity: The Income Tax Treatment of Contract Termination Payments, 49 Minn.L.Rev. 1 (1964), or, for those with smaller appetites, the analysis of cases in 1 Surrey, Warren, McDaniel and Ault, Federal Income Taxation 1049–54 (1972 ed.) must end with deep disappointment at the failure of decisions to fulfill the goals of predictability and of principled decision-making and at the enormous expenditure of professional and judicial time in accomplishing nothing more than a debatable decision of a particular case. "Unfortunately," Professor Eustice reminds us, "matters remain nearly as muddled as ever; and the seemingly unending growth of litigation on this question shows little sign of abating, or, for that matter, of even reaching a general consensus of what the law is, not to mention what it ought to be." Eustice, *supra*, 20 Tax L.Rev. 1. Yet Government counsel said, in answer to a question from the bench, that little would be gained by an attempt at legislative revision since the variety of problems is too great. Perhaps this is so, although even a quick look at the American Law Institute's Draft of a study of Definitional Problems in Capital Gains Taxation (1960) makes one wonder whether a new attempt should not be made.[6] However, we must take the statute as we find it.

When the case was last here, we pointed out that the covenant in the lease, see 476 F.2d at 983–984 fn. 2, from which CBS was relieved by the payment of $125,000, contained elements of two different sorts. One element was CBS' obligation to pay "for removal or destruction of 'property' such as the theatre seats, carpeting, chandeliers, stage curtains and various structural features of the theatre." 476 F.2d at 987. If CBS had paid at the time of occurrence for the removal and destruction of fixtures such as seats and the destruction of structural features, the transaction would have come under § 1231(a). We see no reason why a different conclusion should be reached because the payment was deferred until the end of the lease or because the covenant was settled rather than performed. Indeed, the Tax Court seems to have held as much in Hamilton & Main, Inc., 25 T.C. 878 (1956). We find little force in the emphasis by the Tax Court and the Commissioner on the points that Sirbo had a low or even a zero basis for the seats

---

**6.** *See, e. g.,* the seven page definition of a capital asset, 20–27, and the substitution of "complete disposition", defined at 27–30, for "sale or exchange".

and other fixtures and structural features which have been removed or destroyed, and that some of the seats and fixtures had long since been junked. The "sale or exchange" occurred when they were removed or destroyed; it is of no moment that payment came much later. Compare Waggoner v. CIR, 15 T.C. 496 (1950). On this aspect of the case we adhere to what we previously said, 476 F.2d at 987.

We also suggested, however, that CBS' covenant to remove its own property "clearly was not 'property used in the trade or business'", 476 F.2d at 987. This covenant related mainly to CBS' property, not to Sirbo's; it obligated CBS to remove its property (e. g., control booths, the stage apron extension) so that what had been converted into a TV studio (at some damage to the structure of the premises, an item included in the first element of the covenant) could be returned to a legitimate theatre.

Despite this plain intimation, Sirbo made no effort to supply an allocation on the remand. Perhaps the initial failure to do this had been excusable; within reason a taxpayer should be allowed to contend for the most favorable result in the first instance and to supply an allocation later,[7] as we allowed in CIR v. Ferrer, 304 F.2d 125, 136 (2 Cir. 1962). But we see no basis for according Sirbo not merely a second but a third bite at the cherry, especially when our prior opinion so plainly apprised it of our tentative views. To be sure, we do not reach affirmance with great enthusiasm since the $125,000 payment received in 1964 represented a payment for acts occurring over a period of nearly twenty years; the effect of denying capital gain treatment would be even harsher if the landlord here were an individual. But § 1231(a) does not include all payments representing consideration that had accrued over the years; since Sirbo cannot show a compulsory or involuntary conversion, 476 F.2d at 985–986, for purposes of this appeal § 1231(a) relates only to those payments that constitute "sales or exchanges of property used in the trade or business"—whatever that may be.

Affirmed.

---

**7.** We are not here speaking of contractual allocations, or non-allocations, where different considerations may apply. Compare King Broadcasting Co. v. CIR, 48 T.C. 542 (1967).