United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 29, 1997 Decided November 14, 1997 

 No. 97-5006

 Stichting Pensioenfonds Voor de Gezondheid, Geestelijke en 

 Maatschappelijke Belangen, 

 Appellant

 v.

 United States of America, 

 Appellee

 Appeal from the United States District Court 

 for the District of Columbia 

 (No. 95cv01568)

 K. Peter Schmidt argued the cause for appellant. With 
him on the briefs was Philip W. Horton.

 Robert W. Metzler, Attorney, U.S. Department of Justice, 
argued the cause for appellee. With him on the briefs were 
Mary Lou Leary, Acting U.S. Attorney at the time the brief 
was filed, Loretta C. Argrett, Assistant Attorney General, 


U.S. Department of Justice, and Kenneth L. Greene, Attor-
ney.

 Before: Edwards, Chief Judge, Ginsburg and Tatel, 
Circuit Judges.

 Tatel, Circuit Judge: A Dutch pension fund jointly con-
trolled by employers and unions and claiming to be a "labor 
organization" as described in section 501(c)(5) of the Internal 
Revenue Code challenges the Internal Revenue Service's 
denial of its application for exemption from federal income 
taxation. Because tax exemptions require unambiguous proof 
and because we can find no authority directly entitling the 
pension fund to an exemption, we affirm the district court's 
grant of summary judgment for the United States.

 I 

 Appellant Stichting Pensioenfonds Voor de Gezondheid, 
Geestelijke en Maatschappelijke Belangen (the "Fund") is a 
Dutch pension plan formed in 1969 following negotiations 
between labor unions representing hospital workers and the 
Dutch national hospital employers' association. Soon after 
the Fund's formation, the Dutch government granted it "com-
pulsory treatment," thus requiring all private hospitals and 
their employees to participate. The Fund has since expanded 
to include fourteen health and social welfare sectors in the 
Netherlands. The Fund has no principal place of business in 
the United States, nor does it engage in any trade or business 
here.

 A board of directors controls the Fund's management and 
assets. Pursuant to Dutch law, employers and unions each 
appoint half of the board's twelve directors. The six employ-
er directors and the six union directors enjoy equal voting 
power. If all directors are not present at a meeting, each 
side may only cast as many votes as the side with the fewer 
directors. On all policy issues, employer and union directors 
must agree, or the board may not act. Unions and employers 
also designate equal numbers of directors to all committees 
formed by the board.


 As the second largest private pension fund in the Nether-
lands, the Fund covered approximately one million people as 
of December 31, 1993, some of whom were union members 
and some of whom were not. About 600,000 were active 
contributing members. Some 330,000 of the remaining mem-
bers were "sleepers," a Dutch idiom referring to employees 
no longer working in industry sectors covered by the Fund 
but entitled to receive pension benefits upon retirement by 
virtue of previous employment. The remaining members 
were retirees already receiving pension benefits.

 Both employers and employees contribute to the Fund. 
The board of directors establishes required contribution 
rates, as well as the respective portions of the total contribu-
tion paid by employers and employees.

 The Fund invests in U.S. stocks and mutual funds. In 
1993, its U.S. security custodians withheld and paid to the 
U.S. Treasury over eight million dollars in income tax. 
Claiming tax-exempt status as a labor organization under 
section 501(c)(5) of the Internal Revenue Code, see 26 U.S.C. 
s 501(c)(5) (1994), the Fund filed a claim for this amount. 
Receiving no response from the Service, the Fund filed suit in 
the U.S. District Court for the District of Columbia.

 Noting that taxpayers must prove exemptions "unambigu-
ously," and finding that the Fund lacked "a sufficient nexus 
with a more traditional labor organization to qualify as a tax-
exempt labor organization itself," the district court granted 
summary judgment for the United States. Stichting Pensio-
enfonds Voor De Gezondheid, Geestelijke En Maatschappe-
lijke Belangen v. United States, 950 F. Supp. 373, 374, 379 
(D.D.C. 1996). In doing so, the district court rejected the 
Fund's alternative argument that, even if not entitled to tax-
exempt status, it should have received a refund pursuant to 
section 7805(b) of the Code, 26 U.S.C. s 7805(b) (1994) (su-
perceded by 28 U.S.C.A. s 7805(b)(8) (West Supp. 1997)). 
Stichting Pensioenfonds, 950 F. Supp. at 381. We review the 
district court's grant of summary judgment de novo. Tao v. 
Freeh, 27 F.3d 635, 638 (D.C. Cir. 1994).


 II

 Because the Constitution confers upon Congress exclusive 
authority to collect taxes to provide for the general welfare of 
the United States, U.S. Const. art. I, s 8, cl. 1, only Congress 
itself may create exemptions from federal tax laws. Given 
the importance of taxation and the general presumption in 
favor of taxing all sources of income, courts may not infer 
exemptions when Congress has not clearly provided for them. 
See 1 Jacob Mertens, Jr., The Law of Federal Income 
Taxation s 3.49 (Nov. 1991). For this reason, the Supreme 
Court has consistently held for over a century that a taxpayer 
must "unambiguously" prove entitlement to an exemption: 
"Exemptions from taxation are not to be implied .... they 
must be unambiguously proved," United States v. Wells Far-
go Bank, 485 U.S. 351, 354 (1988); "[T]hose who seek an 
exemption from a tax must rest it on more than a doubt or 
ambiguity. Exemptions from taxation cannot rest upon mere 
implications," United States v. Stewart, 311 U.S. 60, 71 (1940); 
"As taxation is the rule, and exemption the exception, the 
intention to create an exemption must be expressed in clear 
and unambiguous terms.... Legislation which relieves any 
species of property from its due proportion of the burdens of 
the government must be so clear that there can be neither 
reasonable doubt nor controversy in regard to its meaning," 
Yazoo & Miss. Valley R.R. Co. v. Thomas, 132 U.S. 174, 183 
(1889). As Justice Cardozo said for an unanimous court over 
sixty years ago, "Exemptions from taxation are not to be 
enlarged by implication if doubts are nicely balanced." Trot-
ter v. Tennessee, 290 U.S. 354, 356 (1933). With this extreme-
ly high standard in mind, we search for some direct authority 
that unquestionably and conclusively entitles the Fund to the 
exemption it seeks.

 We begin, of course, with the Internal Revenue Code. 
Section 501(c)(5) exempts labor, agricultural, and horticultural 
organizations from taxation. 26 U.S.C. s 501(c)(5). The 
Code neither defines the term "labor organization" nor elabo-
rates on its meaning. The legislative history, moreover, 
provides no unambiguous guidance. The early twentieth-
century congressional debates on whether to include the term 


"labor organization" in section 501(c)'s precursor had nothing 
to do with whether jointly controlled entities providing pen-
sion benefits should be exempt from federal taxation. In-
stead, the debates focused on whether the Code's exemption 
for "fraternal beneficiary societies ... providing for the pay-
ment of life, sick, accident, or other benefits to members" 
would be understood as covering all labor organizations, a 
question that Congress answered negatively when it explicitly 
exempted labor organizations. See 44 Cong. Rec. 4154-55 
(1909). We agree with the district court that this legislative 
history provides "little help" in understanding the scope of 
the term "labor organization." See Stichting Pensioenfonds, 
950 F. Supp. at 375.

 We next turn to the Treasury Regulation that defines the 
term "labor organization," but which is ultimately unhelpful. 
It says:

 The organizations contemplated by section 501(c)(5) as 
 entitled to exemption from income taxation are those 
 which:

 (1) Have no net earnings inuring to the benefit of any 
 member, and

 (2) Have as their objects the betterment of the condi-
 tions of those engaged in such pursuits, the improvement 
 of the grade of their products, and the development of a 
 higher degree of efficiency in their respective occupa-
 tions.

26 C.F.R. s 1.501(c)(5)-1(a) (1997). A nonprofit entity, the 
Fund clearly satisfies sub-paragraph (1). While the Fund 
may also satisfy the first of sub-paragraph (2)'s require-
ments--it has as its object the betterment of employee finan-
cial conditions--it cannot meet the other two requirements: it 
neither works to improve products nor to develop higher 
degrees of efficiency. The Fund urges us to read sub-
paragraph (2) disjunctively, but given the plain meaning of 
the word "and" we cannot do so. See C.K. Ogden, Basic 
English International Second Language 132 (1968) ("And is 
used for joining words together: The man and the woman 
are married. Or is used for the idea of one of two: The man 


or the woman is married."). Although this conclusion would 
otherwise end this case--the regulation does not unambigu-
ously entitle the Fund to an exemption--the Service did not 
rely on the regulation in its brief or at oral argument. 
Because the Service itself does not argue that the regulation 
excludes the Fund from labor organization status, we decline 
to decide the case on that basis.

 Finding help in neither the Code nor the regulation, we 
look next to the IRS's Revenue Rulings, the second most 
important agency pronouncements that interpret the Code. 
Applying the Code to specific situations, Revenue Rulings 
bind both the Service and the taxpayer. Although Revenue 
Rulings "do not have the force and effect of Treasury Depart-
ment Regulations," they are "published to provide precedents 
to be used in the disposition of other cases, and may be cited 
and relied upon for that purpose." 26 C.F.R. 
s 601.601(d)(2)(v)(d) (1997). But because "each Revenue Rul-
ing represents the conclusion of the Service as to the applica-
tion of the law to the entire state of facts involved, taxpayers, 
Service personnel, and others concerned are cautioned 
against reaching the same conclusion in other cases unless 
the facts and circumstances are substantially the same." 26 
C.F.R. s 601.601(d)(2)(v)(e). The Fund can thus prevail only 
by identifying a Revenue Ruling awarding an exemption in a 
case having facts and circumstances "substantially the same" 
as this case. Examining the relevant Revenue Rulings care-
fully, we find no such controlling authority.

 The Service has issued fifteen Revenue Rulings under 
section 501(c)(5). See Stichting Pensioenfonds, 950 F. Supp. 
at 378 nn.2-3 (citing the Rulings). Eleven deal with organiza-
tions completely controlled by unions and thus do not involve 
facts and circumstances substantially similar to those in this 
case. Of the four that concern jointly controlled organiza-
tions, three award tax exemptions, but none of the organiza-
tions covered by those rulings is substantially similar to the 
Fund. See Rev. Rul. 78-42, 1978-1 C.B. 158; Rev. Rul 75-
473, 1975-2 C.B. 213; Rev. Rul. 59-6, 1959-1 C.B. 121. To 
begin with, the organizations do not provide pension benefits. 
Rulings 78-42 and 59-6 deal with apprenticeship committees 


that provide training and education to employees, while Rul-
ing 75-473 involves a jointly controlled dispatch hall that 
allocates work assignments to union members and adjudicates 
grievances over working conditions. Moreover, the labor 
organizations that the Service found exempt in these three 
rulings focus primarily on improving employee conditions on 
the job, while the Fund has as its purpose improving employ-
ee benefits after the job, i.e. pension benefits. The three 
Rulings also differ from this case because none involves 
organizations governed by foreign law. Simply because the 
Service has awarded tax exemptions to labor organizations 
dually controlled under American law does not mean that it 
would necessarily have to reach the same conclusion for 
organizations dually controlled under foreign law, particularly 
since exempting foreign pension plans means that their earn-
ings will escape all U.S. taxation. Earnings of exempt do-
mestic funds, by comparison, are taxed when benefits are 
paid to recipients.

 The Fund argues that it should receive an exemption 
because it conducts appropriate labor organization activities. 
That an organization performs activities "appropriate" to 
labor organizations, however, does not make it a labor organi-
zation under these Revenue Rulings. The Service has said 
only that a labor organization not itself a labor union that 
engages in appropriate labor union activities "may" qualify 
for an exemption. Rev. Rul. 75-473. The Service does not 
end its inquiry upon finding that the organization carries out 
an "appropriate" union activity. Instead, the Service exam-
ines the specific facts of each case, looking to other factors 
such as the organization's purpose, see Rev. Rul. 78-42; Rev. 
Rul. 59-6, and the nexus between the organization's activities 
and the parent labor union's objectives, see Rev. Rul. 75-473. 
Although providing and administering pension plans for 
workers is certainly an appropriate and traditional union 
function, we find no basis for an exemption in this case 
because the Revenue Rulings do not unambiguously stand for 
the proposition that any organization bearing some connec-
tion to a traditional labor union and performing appropriate 
or traditional union functions is necessarily an exempt labor 
organization.


 The fourth Revenue Ruling dealing with a jointly controlled 
labor organization casts even more doubt on the Fund's claim. 
Rev. Rul. 77-46, 1977-1 C.B. 147. In that Ruling, the Service 
denied an exemption to an organization that withheld money 
from union members' pay and invested it, later paying it back 
annually with interest. Although the Fund argues, perhaps 
correctly, that this kind of savings plan differs from a pension 
plan, the Fund's claim for an exemption still ultimately rests 
on inference and implication rather than unambiguous author-
ity.

 The Fund also relies heavily on several General Counsel 
Memoranda. These "GCMs," however, have no precedential 
value. See Disabled American Veterans v. Commissioner, 
942 F.2d 309, 315 n.5 (6th Cir. 1991) (rejecting reliance on 
GCMs on the grounds that "[s]uch informal, unpublished 
opinions of attorneys within the IRS are of no precedential 
value"); Old Harbor Native Corp. v. Commissioner, 104 T.C. 
191, 206-07 (1995) ("[A] general counsel memorandum is not 
binding precedent on this Court."). They therefore cannot 
provide a basis for the Fund's claim.

 The Fund has failed to meet its heavy burden of demon-
strating unambiguous entitlement to tax-exempt status. We 
find nothing in the Code, the regulation, or the Revenue 
Rulings that even comes close to stating that a jointly con-
trolled pension plan governed by foreign law is a labor 
organization exempt from federal taxation. Our doubts about 
the Fund's entitlement to tax-exempt status are not even 
"nicely balanced."

 We recognize that in Morganbesser v. United States, 984 
F.2d 560 (2d Cir. 1993), the Second Circuit, with one judge 
dissenting, held that a jointly controlled pension fund is 
entitled to tax-exempt status under section 501(c)(5). Unlike 
this case, however, Morganbesser involved a pension fund 
organized under U.S. law. The Second Circuit, moreover, 
relied on the precedentially dubious GCMs, never mentioning 
or applying the "unambiguous" standard that we find control-
ling. In any event, the Treasury Department has now pro-
mulgated a regulation providing that "[a]n organization is not 
an organization described in section 501(c)(5) if the principal 


activity of the organization is to receive, hold, invest, disburse, or 
otherwise manage funds associated with ... pension or other 
retirement savings plans or programs." 62 Fed. Reg. 40,447, 
40,449 (1997) (adding proposed 26 C.F.R. s 1.501(c)(5)-
1(b)(1)). Although both parties agree that this purely pro-
spective regulation has no relevance to the case before us, we 
mention it to point out that Morganbesser had a brief life. 

 III 

 We turn finally to the Fund's argument that even if not 
entitled to an exemption under section 501(c)(5), it should 
have received a refund pursuant to section 7805(b) of the 
Code, which gives the Service discretion to apply its rulings 
retroactively. See 26 U.S.C. s 7805(b). The Fund cites IBM 
v. United States, 343 F.2d 914 (Ct. Cl. 1965). After the 
Service granted Remington Rand, a direct IBM competitor, 
an excise tax exemption for its Univac computers, IBM 
applied for a similar ruling for its competing computer. 
Several years later, the Service denied IBM's request, at the 
same time revoking Remington's exemption. Invoking sec-
tion 7805(b), the court held that the Service had abused its 
discretion by taxing IBM but not Remington in the years 
prior to the revocation of Remington's exemption. Id. at 923. 
Relying on this decision, the Fund argues that because the 
Service has exempted two similarly situated British pension 
funds in private determination letters, it likewise abused its 
discretion by failing to give the Fund a refund for the period 
in question, i.e. 1993. We disagree.

 To begin with, IBM applies only to direct competitors. In 
its very first sentence, the court stressed the competitive 
relationship between IBM and Remington Rand: "Interna-
tional Business Machines Corporation ... and Remington 
Rand were, in the years 1951-1958, the two competitors in 
the manufacture, sale, and leasing of larger electronic com-
puting systems." Id. at 915-16. Treating direct competitors 
similarly for tax purposes, the court emphasized, "is peculiar-


ly essential to free and fair competition," id. at 923; see also 
id. at 921 n.8 (noting that IBM and Remington "were the only 
two competitors as to the type of devices involved in the 
Service's rulings"); id. at 923 (indicating that the Service's 
treatment "favor[ed] the other competitor so sharply that 
fairness called upon the Commissioner ... to establish a 
greater measure of equality"). In view of this language, 
courts interpreting IBM have limited it to cases involving 
direct competitors. See, e.g., Wilson v. United States, 588 
F.2d 1168, 1172 (6th Cir. 1978) (characterizing IBM as apply-
ing to Service regulations or rulings that "would lead to 
inequality of treatment between competitor taxpayers"); 
Anderson, Clayton & Co. v. United States, 562 F.2d 972, 981 
(5th Cir. 1977) (same). Because the Fund does not allege--as 
of course it could not--that it competes with the two exempt 
British funds, IBM has no applicability to this case.

 We also doubt that section 7805 even applies here. By its 
terms, section 7805 only applies to a decision by the Service 
to limit the retroactive effect of a ruling. Here, the Service 
has simply denied a refund, taking no action whatsoever with 
respect to retroactivity. Moreover, neither the plain lan-
guage of section 7805 nor any of the cases that the Fund cites 
stands for the proposition that once the Service has treated 
one taxpayer a certain way, it must thereafter treat every 
similarly situated taxpayer exactly the same way. In fact, to 
the extent that Treasury's new regulation denying sec-
tion 501(c)(5) tax-exempt status to pension funds, supra at 8-
9, represents a repudiation of the Service's previous decision 
to exempt the British funds, nothing requires the Service to 
perpetuate its original error by granting the same mistaken 
exemption to other taxpayers. See Sirbo Holdings, Inc. v. 
Commissioner of Internal Revenue, 509 F.2d 1220, 1222 (2d 
Cir. 1975) ("While even-handed treatment should be the 
Commissioner's goal ... [t]he making of an error in one case, 
if error it was, gives other taxpayers no right to its perpetua-
tion.").

 We affirm the district court's grant of summary judgment 
for the United States.

So ordered.