[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 16-17424

————————————————

Agency No. 1454-14


CRI-LESLIE, LLC, DONALD W. WALLACE,
TAX MATTERS PARTNER,

                                    Petitioner - Appellant,


versus


COMMISSIONER OF INTERNAL REVENUE,

                                    Respondent - Appellee.


————————————————

Appeal from the United States Tax Court

————————————————

(February 15, 2018)

Before MARCUS and NEWSOM, Circuit Judges, and BUCKLEW,* District Judge

NEWSOM, Circuit Judge:

    More than 40 years ago, Judge Henry Friendly lamented that "[t]he problem

with respect to the tax treatment of payments for the termination of contract rights

_____

* Honorable Susan C. Bucklew, United States District Court Judge for the Middle District of
Florida, sitting by designation.

having a property flavor is among the most frustrating in income tax law." *Sirbo Holdings, Inc. v. Comm'r*, 509 F.2d 1220, 1223 (2d Cir. 1975). Alas, not much has changed. This partnership-tax case, arising in the same sphere, presents what appears to be a question of first impression: Is a taxpayer that contracts to sell property used in its trade or business entitled to treat as capital gain an advance deposit that it rightfully retains when its would-be buyer defaults and cancels the deal? Constrained by the Internal Revenue Code's plain (if somewhat peculiar) language, we hold that it is not.

## I

The pertinent facts are undisputed. In 2005, CRI-Leslie, LLC paid $13.8 million to buy what was then called the Radisson Bay Harbor Hotel in Tampa, along with the hotel's restaurant—Crabby Bill's—and the prime waterfront property on which both sat. Although CRI-Leslie ultimately hoped to sell the property for a profit, it hired a third party to run the hotel and restaurant in the meantime.

Just more than a year later, CRI-Leslie reached an agreement to sell the property to another company for $39 million. Over the course of the next two years—during which CRI-Leslie (through its manager) continued to operate the hotel and restaurant—the parties amended the contract several times, eventually settling on a total purchase price of $39.2 million, $9.7 million of which was paid

2

immediately to CRI-Leslie as a nonrefundable deposit and would thereafter be credited toward the purchase price at closing. Unfortunately, in 2008 CRI-Leslie's buyer defaulted on the agreement and forfeited the $9.7 million deposit.

On its 2008 tax return—at issue here—CRI-Leslie reported the $9.7 million as long-term capital gain. The IRS, though, later sent CRI-Leslie an "adjustment" for the 2008 tax year—rarely a good thing—in which it determined that CRI-Leslie had improperly reported the amount of the forfeited deposits as net long-term capital gain rather than ordinary income.

CRI-Leslie filed a petition for readjustment in the Tax Court, asserting that the Internal Revenue Code was meant to prescribe the same tax treatment for gains related to the disposition of "trade or business" property regardless of whether the property is successfully sold or (as here) the sale agreement is canceled. The IRS responded that the plain text of the governing Code provisions distinguishes between consummated and terminated sales of trade-or-business property, providing capital-gains treatment only for the former. The parties jointly submitted the case to the Tax Court for decision without trial, and that court agreed with the IRS, holding that under the Code's unambiguous language CRI-Leslie couldn't treat the forfeited deposit as capital gain.

CRI-Leslie filed this appeal, which presents a pure question of statutory interpretation that we review de novo. *Ocmulgee Fields, Inc. v. Comm'r*, 613 F.3d

1360, 1364 (11th Cir. 2010).

## II

We begin with a point of agreement. It is common ground that if the sale of the Radisson Bay Harbor had gone through as planned, the $9.7 million deposit—which per the contract's terms would have gone toward the purchase price—would have been taxed at the lower capital-gains rate. As relevant here, I.R.C. § 1231 states that "any recognized gain on the sale or exchange of property used in the trade or business" shall "be treated as long-term capital gains." I.R.C. § 1231(a)(1)–(3). Section 1231 goes on to specify that "[f]or purposes of this section," the "term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 1 year, and real property used in the trade or business, held for more than 1 year ...." *Id*. § 1231(b)(1). Helpfully, the parties have stipulated that the property at issue here is properly classified as "property used in [CRI-Leslie's] trade or business" within the meaning of Section 1231. Accordingly, it is undisputed that if CRI-Leslie had sold the property in 2008, the resulting income, including the $9.7 million at issue here, would have constituted Section 1231 gain and, as such, been taxed as long-term capital gain.

But of course the deal fell through, and CRI-Leslie didn't sell the Radisson.

Accordingly, the tax treatment of CRI-Leslie's $9.7 million deposit isn't governed by Section 1231, but rather falls under a different Code provision titled "Gains or losses from certain terminations." I.R.C. § 1234A. In relevant part, Section 1234A provides as follows:

> Gain or loss attributable to the cancellation, lapse, expiration, or other termination of … a right or obligation … with respect to property which is (or on acquisition would be) a capital asset in the hands of the taxpayer … shall be treated as gain or loss from the sale of a capital asset.

*Id*. Stated simply, Section 1234A says that any gain or loss that results from the termination of an agreement to buy or sell property that is properly classified as a "capital asset" will, notwithstanding the termination, be treated as a gain or loss from a consummated sale. Section 1234A thereby ensures capital-gains treatment of income resulting from canceled property sales by relaxing the "sale or exchange" element of the Code's general definition of "[l]ong-term capital gain"— *i.e.*, "gain from the sale or exchange of a capital asset held for more than 1 year …." I.R.C. § 1222(3). Critically here, though, Section 1234A applies *only* to property that is appropriately classified as a "capital asset." The statutory analysis here therefore turns on whether the Radisson Bay Harbor was a "capital asset" in CRI-Leslie's hands during the 2008 tax year.[1]

---

[1] A brief aside: For reasons that will become clear—related to the way that the Code defines the term "capital asset" specifically to exclude certain kinds of "property"—CRI-Leslie alternatively contends that perhaps it's only the "right or obligation," and not the hotel "property" itself, that

**A**

As a matter of plain textual analysis, the answer to the question whether the Radisson was a "capital asset" couldn't be clearer. The Code itself defines the term "capital asset" in a way that expressly excludes the property here. As relevant for our purposes, I.R.C. § 1221(a)(2) states that "[f]or purposes of this subtitle"— *i.e.*, "Subtitle A," comprising all Code provisions related to "Income Taxes," notably including Section 1234A—"the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), *but does not include … property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business*." *Id*. § 1221(a)(2) (emphasis added).[2]

---

must be a "capital asset" within the meaning of Section 1234A. *See* Br. of Appellant at 35–43. The Tax Court struck and refused to consider this alternative argument on the ground that CRI-Leslie had raised it for the first time in a responsive brief, having already twice represented that "the only issue remaining is whether § 1234A applies to property which is § 1231 property in the hands of the taxpayer." Because we conclude that the Tax Court didn't abuse its discretion in striking CRI-Leslie's "right or obligation" argument, *see Knowlton v. Comm'r*, 791 F.2d 1506, 1511 (11th Cir. 1986), we needn't address it in any detail here. The argument seems to us meritless, in any event. As CRI-Leslie acknowledges, the "last-antecedent" canon indicates that the term "capital asset" refers to "property," not "right or obligation," *cf. Barnhart v. Thomas*, 540 U.S. 20, 27–28 (2003), and in fact, that's how courts appear to have interpreted Section 1234A, *see, e.g.*, *Alderson v. United States*, 686 F.3d 791, 798 (9th Cir. 2012) (noting that Section 1234A applies only to gain or loss "with respect to property … which is a capital asset in the hands of the taxpayer").

[2] Because Section 1221 defines the term "capital asset" for all of "Subtitle A," which includes Section 1234A, CRI-Leslie's reliance on that term's ordinary meaning—which it takes to include any asset held for long-term-investment purposes—is misplaced. Where, as here, Congress has specified its own definition, we aren't free to impose our own. *See, e.g.*, *Meese v. Keene*, 481 U.S. 465, 484–85 (1987) ("It is axiomatic that the statutory definition of the term excludes

6

If Section 1221(a)(2)'s definition of "capital asset" sounds familiar, that's because it mirrors almost precisely Section 1231(b)(1)'s definition of the term "property used in the trade or business," already examined. *See supra* at 4. There is, however, a decisive difference, which cuts to the very heart of this case: Whereas Section 1231's definition, which applies to consummated sales of trade-or-business property, expressly *prescribes* capital-gains treatment of the resulting income, Section 1221's definition, which applies (via Section 1234A) to terminated sales of such property, expressly *proscribes* capital-gains treatment. Because CRI-Leslie's sale transaction fell through, the controlling question here is whether the Radisson Bay Harbor falls within the terms of Section 1221(a)(2)'s exclusion.

By express agreement of the parties, it does. As the Tax Court observed, CRI-Leslie and IRS have "stipulated that from the date that CRI-Leslie acquired

---

unstated meanings of that term."); *Western Union Tel. Co. v. Lenroot*, 323 U.S. 490, 502 (1945) ("[S]tatutory definitions of terms used therein prevail over colloquial meanings.").

 *Ellis Banking Corp. v. Commissioner*, 688 F.2d 1376 (11th Cir. 1982), on which CRI-Leslie relies, is not to the contrary. The question there was whether certain expenditures made by one bank in connection with its proposed acquisition of another constituted ordinary business expenses, immediately deductible under I.R.C. § 162, or were instead capital expenditures that had to be capitalized under I.R.C. § 263. It's true that in applying the principle that "an expenditure that would ordinarily be a deductible expense must nonetheless be capitalized if it is incurred in connection with the acquisition of a capital asset," we emphasized that we were using the term "capital asset" in "the accounting sense, to refer to any asset with a useful life extending beyond one year," rather than as defined in Section 1221. 688 F.2d at 1379 n.6. Notably, though, neither of the two provisions at issue there—Section 162 nor Section 263—contains the term "capital asset," and accordingly neither required us to apply Section 1221's definition.

the property in 2005 and through December 31, 2008, the property was real property used in CRI-Leslie's hotel and restaurant business within the meaning of section 1221(a)(2)." Accordingly, CRI-Leslie "concedes that the hotel property falls within this exclusion and so is not a capital asset as defined in section 1221."

Based on the Code's plain language, that concession is fatal. Tracing it back up the statutory chain leads inexorably to the conclusion that the hotel didn't qualify for capital-gains treatment on CRI-Leslie's 2008 return. If, as CRI-Leslie acknowledges, the hotel isn't a "capital asset" within the meaning of Section 1221, then Section 1234A's special rule, which treats property resulting from the termination of a contract for the sale of a "capital asset" as if it were derived from a consummated sale of that asset—and thus subject to capital-gains treatment under Section 1222(3)—simply doesn't apply. That's it. End of case.

**B**

Not so fast, CRI-Leslie insists. A plain-text reading of the Code, CRI-Leslie vigorously asserts, impermissibly yields a result that is "illogical, absurd, and directly contrary to the objective of § 1234A." Br. of Appellant at 34. Having carefully considered CRI-Leslie's arguments, we find no basis for disregarding the Code's clear language.

**1**

As for absurdity, CRI-Leslie asserts two incongruities. First, it notes that

8

while all "agree that, had the sale of the [p]roperty been completed, the [d]eposit would have been … applied toward the purchase price and, thus, treated as capital gain" under Section 1231, under a plain-text reading of Sections 1221 and 1234A, "that same deposit must be treated as ordinary income because the parties terminated the [c]ontract rather than completing it." *Id.* That, CRI-Leslie says, makes no sense—especially here, given that it certainly wasn't CRI-Leslie's fault that the Radisson sale cratered. Second, CRI-Leslie complains that reading Section 1234A to exclude trade-or-business property "effectively penalize[s]" taxpayers "for operating a trade or business as opposed to being a passive investor in real property," in which case (as with a consummated transaction) any resulting income would merit capital-gains treatment. *Id.* at 35. Echoing the Tax Court's own admission, CRI-Leslie complains that such "disparate treatment" reflects "intellectual inconsistency." *Id.* at 34. For both reasons, CRI-Leslie insists that the only rational way to read the Code is "to give the termination of a contract the same tax treatment afforded a sale or exchange of the property underlying the contract in order to eliminate differing tax treatment of economically equivalent transactions." *Id.* at 15.

We cannot agree that enforcing the Code's plain language here produces a qualifyingly "absurd" result. The supposed anomalies that CRI-Leslie posits— between completed and canceled transactions, and between active managers and

9

passive investors—may seem a little (or even more than a little) odd, but oddity is not absurdity. *See, e.g.*, *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 565 (2005). While "[t]here is an absurdity exception to the plain meaning rule," it is necessarily "very narrow," *United States v. Nix*, 438 F.3d 1284, 1286 (11th Cir. 2006), and applies only when a straightforward application of statutory text would compel a truly ridiculous—or to use Justice Story's word, "monstrous"[3]—outcome. We are not in that ballpark here—particularly given that, when the sale fell through, CRI-Leslie got to keep not only the $9.7 million deposit (albeit at an ordinary-income tax rate) but also the Radisson Bay Harbor.

**2**

Moving beyond the supposed absurdities, CRI-Leslie insists that a plain-text reading of the Code's interlocking provisions actually "ignore[s] the clear purpose behind the enactment of § 1234A"—which CRI-Leslie says "was to ensure that taxpayers receive the same tax characterization of gain or loss whether the underlying property is sold or the contract to which the property is subject is terminated." Br. of Appellant at 5, 32. For support, CRI-Leslie appeals to statements in the legislative history that it says clearly evince Congress's intent to include trade-or-business property within Section 1234A's ambit. For instance, the committee reports that accompanied the Taxpayer Relief Act of 1997—which

---

[3] 1 Joseph Story, *Commentaries on the Constitution of the United States* § 427, at 303 (2d ed. 1851).

10

broadened I.R.C. § 1234A beyond personal property to include interests in real property—expressed the view that the then-existing law was "deficient" because, among other things, it "taxe[d] similar economic transactions differently." H.R. Rep. No. 105-148, at 453 (1997), *reprinted in* 1997 U.S.C.C.A.N. 678, 847; S. Rep. No. 105-33, at 134 (1997); Joint Comm. on Taxation, *General Explanation of Tax Legislation Enacted in 1997, Part Two: Taxpayer Relief Act of 1997* (H.R. 2014), 1997 WL 34640811, at \*17.

More to the point, CRI-Leslie emphasizes the same reports' citations of two Second Circuit decisions—*Billy Rose's Diamond Horseshoe, Inc. v. United States*, 448 F.2d 549 (2d Cir. 1971), and *Sirbo Holdings, Inc. v. Commissioner*, 509 F.2d 1220 (2d Cir. 1975)—as indicative of the types of transactions to which the amended Section 1234A would apply. *See* H.R. Rep. No. 105-148, at 454 n.13; S. Rep. No. 105-33, at 135 n.80. The taxpayers in both cases were commercial-real-estate lessors who booked gains—effectively in the form of retained deposits—resulting from the termination of departing lessees' contractual obligations to restore leased premises to their original conditions. In short, CRI-Leslie's argument seems to go something like this: (1) the reports' citations to *Billy Rose's* and *Sirbo* demonstrate that Congress wanted Section 1234A to apply to payments resulting from the terminations of real-property leases; (2) leased real estate is clearly "trade or business" property; (3) leased real estate thus cannot be a "capital

11

asset" within the meaning of Section 1221 but (for the very same reason) undoubtedly qualifies as Section-1231 property; and (4) "[a]ccordingly, the only rational conclusion is that Congress intended for § 1234A to apply to property outside of the § 1221 definition of capital asset"—and in particular, to include trade-or-business property that falls within Section 1231's scope. Reply Br. of Appellant at 9–11. In short: "[I]n order to fulfill the legislative purpose underlying the statute, 'capital asset' as used in § 1234A must be read as including § 1231 property." Br. of Appellant at 16.

In fairness, CRI-Leslie's purposes-and-objectives argument is not without foundation, and it seems to have attracted some scholarly supporters. *See, e.g.*, Boris I. Bittker, Martin J. McMahon & Lawrence Zelenak, *Federal Income Taxation of Individuals* ¶ 32.01[4][b] ("Congress concluded that … payments related to the lapse, expiration, or other termination of a right or obligation with respect to a capital *(or § 1231)* asset should result in capital gain or loss …." (emphasis added)).[4] The problem with the view that Section 1234A should be understood to reach Section 1231 property is that *the Code's plain language flatly forecloses it*. As already explained, if an asset *is* Section-1231 property, then by definition—literally—it *is not* Section-1234A property. The reason, again, is that

[4] *See also, e.g.*, Edward J. Roche, Jr., *Lease Cancellation Payments Are Capital Gain? Yes! The TRA '97 Change to 1234A Overturned* Hort, 102 J. Tax'n 364, 364 (June 2005) ("[T]he legislative history does make it clear that amended Section 1234A is applied to Section 1231 assets as well as capital assets.")

12

the definitions of "property used the trade or business" in Section 1231 and "capital asset" in Section 1234A (via Section 1221) are mutually exclusive. Both refer to "property used in [the taxpayer's] trade or business, of a character which is subject to the allowance for depreciation provided in section 167," and "real property used in [the taxpayer's] trade or business." I.R.C. §§ 1221(a)(2), 1231(b)(1). But while Section 1231 expressly prescribes capital-gains treatment of such income, *see id.* § 1231(a)(1)–(3), Section 1234A—through its use of the term "capital asset," which is defined in Section 1221(a)(2)—expressly forbids capital-gains treatment of the same property.

In a contest such as we have here, between clear statutory text and (even compelling) evidence of sub- or extra-textual "intent," the former must prevail. *See, e.g.*, *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998) ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."); *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."). That is so for myriad well-established reasons that we needn't belabor but that, in view of the parties' contending arguments, we recap briefly. As a formal matter, it is of course only the statutory text (as relevant here, I.R.C. §§ 1221 and 1234A) that is "law" in the constitutional sense—that's all that was enacted through the bicameral

13

legislative process and presented to the President for his signature. *See* U.S. Const. art. I § 7, cls. 2–3. And as a practical matter, conscientious adherence to the statutory text best ensures that citizens have fair notice of the rules that govern their conduct, incentivizes Congress to write clear laws, and keeps courts within their proper lane.

\* \* \*

So in the end, this case is actually pretty straightforward: Section 1234A provides for capital-gains treatment of income resulting from canceled sales only where the underlying property constitutes a "capital asset," and Section 1221 defines "capital asset" in a way that all agree excludes the property at issue here. Accordingly, CRI-Leslie is not entitled to treat its $9.7 million deposit as capital gain. Q.E.D.

### III

Now it may well be, as CRI-Leslie asserts, that Congress really did mean for the amended Section 1234A to reach beyond "capital assets" as defined in Section 1221 to include Section-1231 property. Perhaps, that is, Congress just stubbed its toe between the hearing room and the House and Senate floors. Even so, it's not our place or prerogative to bandage the resulting wound. *See Hamer v. Neighborhood Hous. Servs. of Chicago*, 138 S. Ct. 13, 20 (2017) ("[W]e resist speculating whether Congress acted inadvertently."). If Congress thinks that

14

we've misapprehended its true intent—or, more accurately, that the language that it enacted in I.R.C. §§ 1221 and 1234A inaccurately reflects its true intent—then it can and should say so by amending the Code.

The judgment of the Tax Court is **AFFIRMED**.